**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
_____Dayton_____ **DIVISION**

_Andrew Rollison, non-esq_
(Enter Above the Name of the Plaintiff in this Action)

3:21 cv 290

MICHAEL J. NEWMAN

vs.

_United States Secretary of the United States Air Force, Frank Kendall III_
(Enter above the name of the Defendant in this Action)

SHARON L. OVINGTON

If there are additional Defendants, please list them:

_____

_____

_____

_____

2021 OCT 21 PM 6: 29
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON
FILED
RICHARD W. NAGEL
CLERK OF COURT

**COMPLAINT**

1.  Parties to the action:

    Plaintiff:   Place your name and address on the lines below. The address you give must be the address where the court may contact you and mail documents to you. A telephone number is required.

    _Andrew Rollison_
    Name - Full Name Please - PRINT
    _6807 Lowstview Drive_
    Street Address
    _Huber Heights, OH 45424_
    City, State and Zip Code
    _937-931-0751_
    Telephone Number

    If there are additional Plaintiffs in this suit, a separate piece of paper should be attached immediately behind this page with their full names, addresses and telephone numbers. If there are no other Plaintiffs, continue with this form.

Defendant(s):

Place the name and address of each Defendant you listed in the caption on the first page of this Complaint. This form is invalid unless each Defendant appears with full address for proper service.

1. _United States Secretary of the United States Air Force, Frank Kendall III_
   Name - Full Name Please
   _1690 Air Force Pentagon, Washington, D.C. 20330-1670_
   Address: Street, City, State and Zip Code

2. _____

   _____

3. _____

   _____

4. _____

   _____

5. _____

   _____

6. _____

   _____

If there are additional Defendants, please list their names and addresses on a separate sheet of paper.

II. Subject Matter Jurisdiction

Check the box or boxes that describes your lawsuit:

☐ Title 28 U.S.C. § 1343(3)
   [A civil rights lawsuit alleging that Defendant(s) acting under color of State law, deprived you of a right secured by federal law or the Constitution.]

☒ Title 28 U.S.C. § 1331
   [A lawsuit "arising under the Constitution, laws, or treaties of the United States."]

☐ Title 28 U.S.C. § 1332(a)(1)
   [A lawsuit between citizens of different states where the matter in controversy exceeds $75,000.]

☒ Title _____ United States Code, Section _____
   [Other federal status giving the court subject matter jurisdiction.]

Next pages ~ Separate page listing them all and included in narration of agency wrongdoing and claims ~ Next pages

-2-

III. Statement of Claim

Please write as briefly as possible the facts of your case. Describe how each Defendant is involved. Include the name of all persons involved, give dates and places.

Number each claim separately. Use as much space as you need. You are not limited to the papers we give you. Attach extra sheets that deal with your statement claim immediately behind this piece of paper.

Three separate claims against employe attached separately with numerous violations of federal statute and DoDI instructions cited under the three claims as violated. All pages needed in Plaintiffs non-lawyer opinion. Sorry for the size. For ease of processing, including evidence also mentioned in 3 claims 3 narrative —immediately following it to demonstrate claims as not being frivolous.

Audio evidence (MP3 recordings) can be provided on demand. Mentioned numerous times in claims, 5-6 hours long and have segments broken up with description in titles. To assert abuse claims and overall handling unlawfully by employe against federal law and DoDI statutes. (16B file size for total file) Now included on DVD Exhibit

-3-

District Court Filing Case Law and Statute/Regulation Violations

1. U.S.C. § 2302(b)(10)

2. 5 U.S.C. Section 7702(b)

3. DoDD 6495.01, Sexual Assault Prevention and Response (SAPR) Program, dated 11 September 2020

4. Johnson v Department of Veterans Affairs, No 05-3149 (Fed Cir 2006)-based on case law Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983)

5. Rehabilitation Act of 1973, as amended

6. Title 42, Section 12102

7. Title VII Of The Civil Rights Act of 1964 (CRA)

8. Sulima v. Tobyhanna Army Depot LLC DS2, United States Court of Appeals-Third Circuit, No. 08-4684, April 12, 2010

9. NLRB v. J. Weingarten, Inc. 420 U.S. 251 (1975), as amended

10. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), as amended

11. Civil Service Reform Act-5 U.S.C. §7703 (b)(2)

12. Feres v. United States, 340 U.S. 135

13. Federal Employee Review Processes For Major Disciplinary Actions U.S. Merit Systems Protection Board (Diagram based on federal statutes and relevant to jurisdictional designations here)

14. The Whistleblower Protection Act of 1989 (WPA), as amended

15. Computer Fraud and Abuse Act of 1986 (CFAA), as amended

16. The Stored Communications Act, 18 U.S.C. Chapter 121 §§ 2701–2712, as amended

17. The Hatch Act of 1939, as amended

18. Title 7 of Public Law 88-352

District Court Filing Case Law and Statute/Regulation Violations

19. Section 701 of Title 29, U.S.C.

20. Public Law 88-38

21. DoDI 1020.04, "Harassment Prevent and Response for DoD Civilian Employees," dated June 20, 2020, as amended

22. DoDD 5505.06 'Investigations of Allegations Against Senior DoD Officials'

23. 5 U.S.C. §7702 (a) & b(5)(A)

24. C.F.R §§ 1614.407 & 1614.408

25. 29 U.S.C. §1132 (e)(2)

26. The Health Insurance Portability and Accountability Act of 1996 (HIPAA)

27. Ohio Revised Code § 2903.211

28. Equal Pay Act of 1963

29. Fair Labor Standards Act of 1938

30. AFI 36-129, Chapter 8.4.1.1 and Chapter 8.4.1.3

31. The Fourth Amendment to the U.S. Constitution

32. 5 U.S.C. 2302b, Pub.L. 101-12 as amended

33. SAPR under DoDD 6495.01

34. DoDI 1438.06 ' DoD Workplace Violence Prevention and Response Policy", dated 16 January 2014

35. The Sixth Amendment to the U.S. Constitution

36. 18 U.S. Code Chapter 113C—TORTURE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**ANDREW ROLLISON**                    Case No.:
6807 Locustview Drive
Huber Heights, Ohio 45424              Judge

        Plaintiff,

vs.

**SECRETARY OF THE AIR FORCE**          **COMPLAINT WITH**
Frank Kendell III                       **JURY DEMAND**
1670 Air Force Pentagon
Washington, D.C. 20330-1670

        Defendant.

---

    Now comes Plaintiff Andrew Rollison ("Rollison") by his own counsel, as requesting waiver of court fees per separate application submitted along with pro bono representation as identified in EEOC Petition Number 2021003811, Decision Memo (dated 23 September 2021 and at attached) and for his Complaint against Defendant Secretary of The Air Force herein after referred to as "Defendant" states as follows.

    I.      **PARTIES, JURISDICTION & VENUE**

1.      This is an action for wrongful discharge (Claim I), improper handling of an employment

medical reinstatement request (Claim II) and for violations of numerous federal statutes and

regulations by the Defendant against the Plaintiff (Claim III). It is timely filed in accordance with

EEOC Petition Number 2021003811, Decision Memo (dated 23 September 2021 and at Exhibit

1) in part to overturn the rulings of three lower courts/forums of federal employee redress (Office

of Special Counsel, Merit Systems Protection Board and Equal Employment Opportunity

Commission). It also seeks to provide redress against conduct committed by Defendant in

violation of numerous federal statute and military policy towards Plaintiff. Plaintiff first filed an

Office of Special Counsel (OSC) Complaint (Form 14-Exhibit 2) citing a Prohibited Personnel

Practice (PPP) violation of U.S.C. § 2302(b)(10) by Defendant in its removal of Plaintiff from

employment. Plaintiff, admittedly, had a grievance filed by counsel (David Duwel, esq) prior

with OSC (also Exhibit 3), citing numerous violations of PPPs to include Whistleblower

Retaliation. OSC Form 14, under non-systemic PPP violations has a number of options to file

employee complaints to try to initiate investigation by OSC. Systemic complaints are permitted

but complainants are unable to seek redress under such a filing if they are for example

unlawfully removed from employment for attempting to Whistleblow (merely identifying what

they perceive is a government-wide problem, which to a degree this is in DoD). Plaintiff filed a

non-systemic complaint requesting redress. Plaintiff's union stewards and local chapter President

in October of 2019, had declined to represent him in any way against the Defendant's removal of

him from employment even after at an earlier time expressing support for him and assuring him

they would be instrumental in aiding him as a long-standing member (under usual circumstances,

employees aggrieved by Defendant and represented by the union are afforded grievance rights by

the Covered Bargaining Agreement-their refusal to do so for Plaintiff is suspect and not-

customary, especially given the fact he had contacted them 7 months prior to an alleged workplace incident-later described). Plaintiff had at a time prior to October 2019 (in February 2019) told same union (AFGE, Local 1138) about numerous instances of harassment (some of which was described as sexual assault). Both union and Plaintiff resolved contacting local employment counsel was most appropriate to handle claims such as how he described them. As will be described in later narration of this claim, Plaintiff encountered substantial resistance by local legal harassment professionals essentially prohibiting him from getting a consultation to see what options he may have had, preventing further instances of harassment and Plaintiff later became ill from medical malpractice and the hostile work environment up until the point the Defendant alleges Plaintiff called an immediate manager, resigned and threatened him (allegation is this occurred on August 19, 2019 in the evening). After said union declined at a later point to aid Plaintiff in a grievance against agency's harassing and retaliatory behavior (including arrest and an unlawful removal) over numerous harassment disclosures to its law enforcement representatives, 88SFS (possibly an Unfair Labor Practice under Section 8 of the The National Labor Relations Act of 1935, as amended), Plaintiff then obtained local employment counsel in November of 2019 with the intention to combat agency actions against him while still in the midst of a yet identified or confirmed medical illness. Plaintiff's union also ascribed in October 2019 that obtaining legal counsel in Dayton, OH for issues against the base was very restrictive and even seemingly relayed a message from base officials that if he contacted the base's EO office, base officials would make up charges (criminal) against Plaintiff. Plaintiff's attorney filed, as stated, numerous OSC Form 14 Prohibited Personnel Practices (PPPs) as identified to him by Plaintiff to try to reinstate his employment. Plaintiff's attorney's filing did not include a PPP violation of U.S.C. § 2302(b)(10). Plaintiff, at a later point of his

3

counsel's filing, did find new evidence or regained competence/memory to substantiate this new claim was a potential reason for the employer's gross abuse of Plaintiff (to include forceful sexual contact by a former immediate manager which had/has caused Plaintiff severe emotional distress both inside and outside of the workplace due to the actions of the employer and management in not addressing it). Plaintiff, having filed a new PPP charge against the agency, was met with invalid conclusions by OSC, Merit Systems Protection Board (MSPB) and Equal Employment Opportunity Commission (EEOC) that he had refiled the exact same claim as his attorney did prior. The OSC Form 14, as well as their website, clearly distinguishes that not all PPPs are the same for making claims. Whistleblower Retaliation is one type, whereas U.S.C. § 2302(b)(10) is another for discrimination over conduct (including sexual orientation/gender identity) not adversely affecting employee performance or co-worker performance. Both Plaintiff's personal life he wished to remain private and reaction towards repelling unlawful-forced sexual contact by an immediate manager are cause to state his sexual orientation of straight was being attacked and discriminated against by an apparently closeted homosexual manager, who wanted Plaintiff removed from employment after his sexual advances were not reciprocated. Plaintiff had earlier perceived him to be a straight, married man with children and was deeply upset and offended upon a sexual assault in mid-2017 (described in detail later). OSC, for reasons not clear to Plaintiff, declined jurisdiction to investigate his claim. OSC did not declare there was no merit to what Plaintiff alleges and even at later points Defendant appears to write its pleadings in this fashion (but then try to procedurally attack Plaintiff from obtaining justice). Plaintiff provided OSC dates/times of many instances of sexual, medical and stalking type harassment, photographic evidence of some sexual harassment and access to audio files of medical harassment along with apparent incidences of stalking by the agency or its employees.

Not only this, access to audio interacting with 88SFS police who circumvented DoD civilian harassment policy to protect predator employees over the Plaintiff. All within its rights (OSC) and mandates, as an independent arm of the federal government, to investigate gross violations of federal law by other agency's of the government including DoD (USAF) when they will not (88SFS lied to Plaintiff and conducted no sexual assault or harassment investigations). OSC, in its issuance of an IRA appeal letter (Exhibit 42), misquoted Plaintiff's actual complaint filed as violating 5 U.S.C. §§ 2302(b)(8) and (b)(9) instead of U.S.C. § 2302(b)(10). This also corresponded with other behavior by OSC not aligning with its customary practices, including allowance of a 13 day comments period over their initial claim of lack of jurisdiction. Plaintiff was possibly the subject of retaliation by the deciding OSC attorney for having filed an OSC IG complaint that in his counsel's filing, they refused to do their federally mandated job. Plaintiff was not afforded the opportunity to correct their understanding of his complaint (PPP) as filed, but it was so distinctly marked on their Form 14, its cause to state OSC was trying to force Plaintiff's complaint of violation of U.S.C. § 2302(b)(10) to be something other than what it was in order to quickly dismiss their actual jurisdiction in the matter (bullying). Plaintiff, at no point during communication with them or afterwards in proceeding to MSPB agrees with this clear attempt of manipulating Plaintiff from having his actual claim heard. Plaintiff told MSPB's Chief Administrative Law Judge (ALJ) that if the court wished to re-open its conclusions surrounding their initial ruling on Plaintiff's counsel's filing he was open to re-addressing the matter but clearly differentiated between the two filings (with statute cited) as it not being for Whistleblower Retaliation. If there were never any cause to file multiple claims, there would not be different U.S. Code statutes for each particular type of offense an employer may commit against an employee. Nothing in the process of OSC, MSPB or later EEOC expressly forbids a

Plaintiff, when faced with new evidence to support new claims (PPPs) or regaining (in this case) competence/memory over evidence possessed or found, from re-filing a new OSC Form 14 claim for new violations of PPPs substantiated with said evidence or the employee's narration. The initial complaint of Plaintiff's counsel did not include U.S.C. § 2302(b)(10) and does not quote such statute as being a violation by the Defendant at any point in his proceedings. The USAF, in its filing before MSPB against Plaintiff's filing an Initial Appeal, rather callously filed a writ to declare a dismissal based on the doctrine of 'Res Judicata'. Callous in the manner of having completely violated previously their own (DoD) internal instructions on processing a victim of sexual assault (one in which they made up on the fly their own guidelines to punish the victim over the predators) and seeing in what was submitted that the PPP, as filed with OSC, is expressly/clearly different and based on completely different federal statute. Defendant filed a Motion to Dismiss claiming the court lacked jurisdiction in the matter using 'Res Judicata' as the basis. Both the prior judge at MSPB over separate claims and the judge hearing what was filed as a lawful new complaint tried to uphold the earlier court's decision of a frivolous claim of Whistleblower Retaliation and cast the actual filing as the same. Plaintiff pointed out to the ALJ, that the OSC IRA letter was citing errant statute over what was filed U.S.C. § 2302(b)(10). He revealed how that original MSPB judge had discarded evidence described to her of instances of Whistleblower Retaliation to which she did not permit a formal hearing for it to be viewed (also callous). It was described to her in Plaintiff's attorney's filing (direct e-mail evidence of Whistleblower Retaliation), but at least in Plaintiff's treatment, they limited proceedings to just descriptive narrative only (even if the laws surrounding their forum say some visuals are perfectly fine). Further, the Plaintiff described retaliation ongoing during the proceedings against him previously by opposing counsel or affiliated parties along with possible intimidation by a

family member of the ALJ herself. In an attempt to overturn her decision as the case being decided by a biased, non-competent ALJ. What the Plaintiff described actually happened and he offered both the ALJ and Defendant a polygraph examination over his claims and even the behavior of the judge and/or her family member based on what appeared to be a visual match to her family member. The new ALJ did not address this activity in her ruling. The original ALJ was shortly after filing a MSPB IG complaint removed from the court or resigned. Which on its own accord, should have been a motivator to at least review what that first judge would not evidence wise if not overturn it outright as it alludes to affirming the allegations. Not only this, the first ALJ declared the Plaintiff to be a current or former military member in her ruling, which was never submitted by Plaintiff or his attorney as factual. But, in the context of the Defendant's behavior and her's is supportive of their constant procedural attack filings trying to undermine Plaintiff's civil rights to file a claim or tort claim against the military. Plaintiff and/or his counsel wanted to first give the U.S. Government and Defendant the opportunity to redress on their own conduct before proceeding to a civil lawsuit, but were clearly off the mark or not expecting such callous and crude behavior by federal officials. Only U.S. military members cannot file claims of tort against the U.S. Government for damages suffered in the line of duty (physical, psychological, etc.), not civil servants. This is attempted imposition of the Feres Doctrine on the Plaintiff, a violation of his constitutional right to due process and a delay tactic to prolong an already damaging set of circumstances for the Plaintiff (meant to be cruel). Plaintiff did clarify these facts for the judge, asserted his claim was new (only the outcome of what is being requested is similar under each filing which is not the same as the intent of 'Res Judicata' as to dismiss completely similar claims, not judgments). Plaintiff was not filing to get double damages or double his job back, it was merely an overlooked factor he found cause along with his counsel

7

to file over. The ALJ, did not consider any evidence submitted to support his claims, she in fact ordered much of it redacted (or placed it into destructive narrative form which ruined his presentation of events/incidences and evidence) even to the point of violating what is permitted in her forum. She expressed guidelines Plaintiff could easily establish to declare 'Res Judicata" was not applicable and did he that he filed a new separate charge of employment discrimination and not Whistleblower Retaliation. Further, again, Plaintiff on his own devices and with the consent of his counsel filed a second charge that the Standard Form 50 (SF-50) provided to him by the Defendant was also invalid and was based on an alleged resignation during a timeframe he was not medically competent (described in detail later). The ALJ declared if the Plaintiff established that if what was described in her guidelines (based on federal statute) were met with regard to an involuntary resignation was proven, Plaintiff was entitled to reinstatement at the very least. Plaintiff had clear and convincing proof of a medical illness inhibiting his mental competence as a result of medical malpractice. Plaintiff has/had a condition requiring medication dosed in accordance with a specific set of life factors scenarios as declared by the drug manufacturer. His doctor did not follow this, misled him over side effects, dosed him as such to make him ill, tried to setup unnecessary testing over misleading side effects information and committed malpractice by not re-assessing or re-dosing the prescription after Plaintiff identified medical illness associated within two weeks of taking. Plaintiff was misled over side effects as to not know it could cause psychiatric side effects mirroring the symptoms of schizophrenia. The medical provider was a well rated, respected doctor in the Beavercreek, OH community (where a large portion of military personnel reside). Plaintiff established with evidence erratic/bizarre behavior upon taking the medication in digital forms (i.e. e-mails, notes, etc), the actual medical communications with the provider (what remained after they destroyed much of it after he later

8

contacted malpractice attorney's) showing progressive side effects and also offered other confirming evidence the drug was causing hallucinations, an altered mental state and a host of physical/psychiatric side effects in alignment with what is public knowledge about the drug's interactions when dosed too high. Further, Plaintiff described with dates/times and attempted to show audio/photo/video evidence of a hostile work environment which met her definition of what constituted one. That is, unless she conducted a national survey that stated sexual assault, sexual harassment, medical harassment, privacy invasions and outright stalking are not enough to cause an ordinary employee to want to resign (dubious is her claim it was not enough). She ruled that 'Res Judicata" was applicable when it was not, in an in your face irrefutable way not, established with the U.S. Government's own forms not to be the same claim or set of claims and she ruled that an alleged resignation was done competently and within the proper procedures of the agency at which it happened (a clear lie on both accounts to be demonstrated later). She and the Defendant (USAF) changed the goal posts in step together, so to speak, based on the perjury of the Defendant and later herself (it is perjury for legal officials to mislead to a conclusion for the expressed benefit of one party of a claim, when they can see what they are ruling is definitively false). The USAF claim of 'Res Judicata' should be considered as part of a campaign towards obstruction of justice and as earlier stated imposition of the Feres Doctrine against the Plaintiff which is unconstitutional. As will be demonstrated in the pages to follow, Defendant had already violated Plaintiff's civil rights, employee rights and right to privacy in his personal life; so more violations of the law or attempts at suppressing Plaintiff's rights as a U.S. Citizen are of no concern for Defendant or its counsel. As Plaintiff noted to the Chief ALJ at MSPB, Defendant counsel has a history of trying to suppress evidence for both law enforcement (where police are subject to investigation for killing arrestees without cause-suppressing body cam

footage) and now the USAF. He seeks out to do evil in his profession, which now includes trying to provide taxpayer funded legal representation for sexual predators in the ranks outside of DoD policy (he works for DoD). Also, in a follow up with EEOC, Plaintiff's charge of discrimination under U.S.C. § 2302(b)(10) was again, in a vicious manner, discarded with lies based on the same claim of him re-filing a Whistelblower Retaliation claim. A concerted effort of bullying him, flying in the face of established federal laws and internal instructions of the employing agency. EEOC had a statutory requirement to hear Plaintiff's or review Plaintiff's discrimination claims. But since they refuse to believe in evidence (OSC Form 14) submitted to them that a new charge was filed (as declared by 2 other incompetent forums), they have resorted to breaking 5 U.S.C. Section 7702(b). They try to assert it is not a mixed case or included no discrimination claims because a prior court ruled this. They are, in fact, a separate agency, with the ability to overturn and accept complaints when such things occur. It's perfectly reasonable to state these three agency's with the help or involvement of the Defendant have conspired to undermine the court system for federal civilians seeking redress over agency wrongdoing. They (EEOC) had these factors expressly called out to them in an initial complaint (Exhibit 4) that there are numerous PPPs, which they know already and they have declared that they are allowed to act delusional (perhaps as to mock the Plaintiff and his valid medical issues he encountered), which they are not permitted to be so as an agency under the law. The law was clear to them and so was the claim Plaintiff filed. The military is known to have a sexual assault epidemic on its hands and these agencies wish to declare that reality is not so (further trying to cause emotional distress and manipulation of victims including Plaintiff). This case is part of that epidemic needing addressed as Plaintiff made every effort to have the issues involved addressed in the most appropriate manner. Harassment disclosed early enough to his comfort level and to take legal action to union

officials, charged with protecting him under such work conditions and legal professionals equally as responsible ethically to intervene where they are needed (and were requested here to help to no avail). As will be described in later sections, the DoD has no anti-harassment resources available to civilians as in comparison to military personnel. Their SAPR programs and SARC offices are only for civilians stationed overseas in normal cases per DoDD 6495.01, Sexual Assault Prevention and Response (SAPR) Program, dated 11 September 2020, as amended. Even what is available to civilians in those overseas climates is limited. Legal representation/counsel is a logical part of the initial stages of addressing such issues which was reviled by base officials upon Plaintiff's disclosure to them when they had nothing else to put up to address what he encountered. They knew of one option (EEO), but proceeded to erect barriers physically towards that end (taking his base badge away and disbarring him from the base where the EO office is located) and legally (with intimidation and threats of false crimes through his union stewards). They were or had been actually threatening felony menacing charges, which is actually the charges that should have been brought under the Ohio Revised Code against the predator employees in Defendant's workplace who stalked Plaintiff. This was more blaming the victim behavior by Defendant. If this all sounds like some big conspiracy theory and set of frivolous claims by the Plaintiff, it is not. A minor amount of research on how the DoD treats sexual assault victims, demonstrates a plethora or multitude of retaliation and abuse of various types after disclosures are made (to the point of murder). There is no other industry or employer in the United States where employees are likely to be treated so poorly or face being killed for disclosing wrongdoing as in the Department of Defense. Those (including Plaintiff) are our nation's heroes being targeted and attacked for serving their country. The Plaintiff asks the presiding judge to do a simple search on the topic online or review some human rights reports on

DoDs treatment of victims to get an idea of how they react opposite to their own regulations to cover up or punish the victims for disclosing what they tell victims to disclose in training. Think about this fact DoD IG only convicts ~5% of reported sexual assaults complaints. Commanders take no action on over 70% of claims (Defense Advisory Committee on Investigation, Prosecution, and Defense of Sexual Assault in the Armed Forces: Report On Investigative Case File Reviews For Military Adult Penetrative Sexual Offense Cases Closed In Fiscal Year 2017, dated October 2020). Plaintiff's treatment, even so with the commonness of retaliation in the military, seems bizarre (new forms of retaliation perhaps using technology) and in excess. The behavior he experiences from the predatory employees was exceeded in some sense by federal officials charged with protecting him from further abuse themselves (also described in detail later). Plaintiff has reached out to many agencies to address what he encountered and even how to deal with it and has received a resounding amount of stonewalling by the sexual assault prevention and treatment community. No explanation for why, just the actual behavior of these parties towards him for coming to them in all sincerity and in some cases to help their causes with knowledge he possesses from his experiences. So with this procedural description of how Plaintiff has moved to this stage of filing a civil action in the District Court, Plaintiff makes the following claims in support of redress or damages awarded to him (professionally and monetarily) from the abuse(s) he suffered by the Defendant and their reaction to his disclosure to multiple parties (under which some knowledge of it was pre-maturely and illegally obtained by them to intimidate him from carrying forward in seeking justice). Claim I, as charged, is predicated on his employer's repeated allegations (unwanted forceful sexual advances) by his previous immediate supervisor and coworkers about his perceived sexual orientation, hostile work environment involving sexual assault, sexual harassment, medical treatment harassment,

privacy/civil rights violations and reprisal employment discrimination pursuant to 5 U.S. Code § 2302 (b)(10), as amended. The sexual harassment itself and predominance of other forms of harassment mentioned is the resultant of discrimination/obsession/fixation over Plaintiff's personal life activities in which he wished to keep private (referenced in OSC Form 14), in which he had a right to privacy, was not a factor in affecting his employment performance, was or is not a factor in how Defendant treats other employees, is not against his employment agreement/contract signed with the Defendant (one in which they actually violated the agreement over a course of years-Exhibit 5), is not a violation of Defendant's security clearance process (nor a matter of questioning) and in general is/was an all out attack on his sexual orientation as a straight male by closeted gay males. These two primary factors of conduct (night life described in OSC Form 14 which is of some relation to his sexual orientation and his sexual orientation/gender identity), are reasonably considered to be outside the workplace factors, not affecting his work performance over which he was harassed and ultimately wrongfully discharged over as he did not reciprocate his management's sexual advances. At no time of employment, did Plaintiff hear other employee's reference their own sexual orientation/gender identity or much in the way of sexual activity in general so as to be forced to compel description of his. So Plaintiff's want of privacy and not wanting to be harassed sexually counter to his sexual orientation in this regard was not an outlier in this professional setting. If others had a different experience in this regard working for Defendant, Plaintiff was never informed of it but he became targeted in mid-2017 over these factors without his consent or want to be forced to be exposed in such a manner as to his preference as a straight male. If this or his night life proceeding mid-2017 became as such a factor for Defendant or its employees to have poor performances, Plaintiff contends his right to privacy was violated by the employer such as to

13

cause this as he did not reveal such factors of most aspects of his private life (in particular sexually) nor his relationships in large part. There is evidence the employer and its management had a sexual fixation on Plaintiff and these factors to the extent just described of committing crimes to find out about his personal life. But even still, one Offender harassing Plaintiff expressly knew his exact sexual orientation or would reasonably be considered to understand this and still accosted the Plaintiff (Jon Porter). Plaintiff had in casual conversation mentioned an active, ongoing relationship at one point with a female to him.

Secondly (Claim II), the employer (or its agent Air Force Office of Special Investigations, also known as AFOSI) was in receivership of a complaint by the Plaintiff that included a request (made in February of 2020) for reinstatement to employment based on serious side effects he was experiencing from May to November of 2019 from a medically necessary prescription drug dosed incorrectly causing earlier described serious physiological and psychiatric side effects. This was also a formal request to accommodate both his medical condition and any further potential side effects of a properly dosed prescription. This second claim of improper handling of a medical request for employment reinstatement is predicated on the employer denying reinstatement to employment when the Plaintiff became completely withdrawn from the overdosed prescription medication causing him to not be himself in personality and incompetent mentally during the period of time described before he effectively ran out of medication which is a claim pursuant to factors cited in Johnson v Department of Veterans Affairs, No 05-3149 (Fed Cir 2006)-based on case law Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983), Merit System Protection Board's own guidelines as situations where an employee's resignation may have been involuntary (Exhibit 6) and the Rehabilitation Act of 1973, as amended. Plaintiff's side effects are/were a temporary disability covered by Title 42, Section

14

12102 as the ameliorative effects of the mitigating measure (the prescription drug in this case) was a debilitating/disabling factor that could have led to any host of erratic actions including what Defendant describes as a series of calls resigning with language not customary from the Plaintiff to his manager. **Even with these medical factors present, the Defendant publicly advertises on its SAPR/SARC sexual assault awareness website that had the Plaintiff committed the actions described by them with 100% certainty as depicted in Defendant's transcripts at MSPB, it is perfectly acceptable behavior by a sexual assault victim against predator employees. In the Exhibit 7 WPAFB SAPR/SARC website screen-capture they state on one line "There is no "right way" in dealing with a sexual assault. It is okay to be angry." If this is the case, then why is Defendant's legal office fighting Plaintiff's reinstatement. There has been a victim identified in the local news at Area B of WPAFB who has received justice in the form of an indictment against 'her' attacker and is by all accounts still employed at WPAFB. It is unlikely she was not angry over her treatment (she told someone to get the wheels of justice rolling in her case), it is unlikely they mislead her, disparaged her, arrested her after a disclosure, assaulted her after a disclosure, denied her employee and civil rights, detained her and tortured her for making a disclosure. This is the treatment of the Plaintiff, equally upset over his harassment and had tried repeatedly to get someone to take action against his predators in the same town. What is the difference between the two, sex plainly. Thus violating Title VII Of The Civil Rights Act of 1964 (CRA) as employment discrimination against the Plaintiff on the basis of sex. Defendant alleges Plaintiff called in to state three times to a supervisor who had been harassing/stalking him and was friends with another previously harassing/stalking him "Mike, this is 'X name'. Its 6:00 and I quit. Do not contact me again or you might find yourself six feet deep. Fuck the feds. PS-10. Try not to turn into a homosexual like Zane Butcher, Jon Porter and Ryan Mormon". They

15

changed the name X three times on their transcripts, misspelled two predatory employees's names to John from Jon (not sure why) and turned one predatory employee's last name into a religious context (Moorman to Mormon). The names they said called were Andrew, Joe and John. Their pleading surrounding these transcripts was rife with giving each-other accolades for being good Christians and accusing Plaintiff of being a whole different personality than what is actually true of him. That along with accusing Plaintiff of being a bad employee (not matching performance records-Exhibit 8) and ending friendships in a way as to portray him as unpatriotic or not a good friend to one predatory military employee he had treated like a brother until he was sexually accosted by him. Further, there is relevant case law per the Plaintiff's exact medical situation of encountering debilitating side effects of a prescription drug that is medically necessary leading to workplace issues in Sulima v. Tobyhanna Army Depot LLC DS2, United States Court of Appeals-Third Circuit, No. 08-4684, April 12, 2010, as being cause towards requesting and obtaining reinstatement to employment in the federal sector (was a federal contractor in that case).

Appellant predicates his final claim, Claim III, on that he has been subjected to numerous violations by Defendant along with some federal officials in these matters of both federal statute and internal Defendant instructions pursuant to factors cited in NLRB v. J. Weingarten, Inc. 420 U.S. 251 (1975), as amended, Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), as amended, Civil Service Reform Act-5 U.S.C. §7703 (b)(2), Feres v. United States, 340 U.S. 135, Federal Employee Review Processes For Major Disciplinary Actions U.S. Merit Systems Protection Board, Title VII of the Civil Rights Act of 1964 (CRA), as amended, the Rehabilitation Act of 1973, as amended, The Whistleblower Protection Act of 1989 (WPA), as amended, Computer Fraud and Abuse Act of 1986 (CFAA), as amended, The Stored

Communications Act, 18 U.S.C. Chapter 121 §§ 2701–2712, as amended, The Hatch Act of

1939, as amended, Title 7 of Public Law 88-352, Section 701 of Title 29, U.S.C., Public Law 88-

38, DoDI 1020.04, "Harassment Prevent and Response for DoD Civilian Employees," dated June

20, 2020, as amended, DoDD 5505.06 'Investigations of Allegations Against Senior DoD

Officials' and "DoD Workplace Violence Prevention and Response Policy", dated 16 January

2014, as amended.

2.      Plaintiff is a resident of Montgomery County, Ohio and a current/former employee of

Defendant's Wright Patterson Air Force Base in Wright-Patterson AFB, Ohio.

3.      Defendant Department of the Air Force has a base of operations at Wright Patterson Air

Force Base and is Plaintiff's current/former employer (awaiting court's decision).

4.      Jurisdiction in this Court is proper pursuant to U.S. Equal Employment Opportunity

Commission, Petition No. 2021003811, § Petitioner's Rights To File A Civil Action (W0610) see

authorities also cited in 5 U.S.C. §7702 (a) & b(5)(A) and C.F.R §§ 1614.407 & 1614.408

respectively-Exhibit 1). Along with diagrams depicted in Federal Employee Review Processes

For Major Disciplinary Actions U.S. Merit Systems Protection Board. Plaintiff asserts Claim I

and the applicability of MSPB's court diagrams.

5.      Venue properly lies within the Southern District of Ohio pursuant to 29 U.S.C. §1132

(e)(2) because the acts herein complained of have occurred within this district.

6.      On or about September 23, 2021 the Equal Employment Opportunity Commission issued

a decision (Exhibit 1) which, granted Plaintiff pursuant to 5 U.S.C. §7702 (a) & (b)(5)(A) and 29

C.F.R §§ 1614.407 & 1614.408, along with 'Federal Employee Review Processes For Major

Disciplinary Action: U.S. Merit Systems Protection Board', the expressed right to bring this

action (sue) in this Court no later than thirty days after the date the decision became final, which

17

by language in the decision was issued September 23, 2021. Plaintiff has timely filed this Complaint.

## II.     FACTUAL BACKGROUND

7.     Plaintiff restates the previous allegations of paragraphs 1-6 herein.

8.     Plaintiff began employment with Defendant in June 2003 as a Summer Hire and was later appointed as a Logistics Management Specialist in February 2013 under an employment agreement (Career Growth Ladder, GS-7 to GS-12) violated by the employer from the outset in denying him promises made under the agreement (training specifically). This denial of fulfilling a training element to the agreement signed was from the outset meant to deny Plaintiff employment opportunities in the Defendant's global pool of advertised jobs where they emphasize training as a hiring factor (training is a big factor for advancing in the USAF, as is noted on one of his late appraisals in 2019). Plaintiff's supervisors (one later cited as committing Equal Pay Act violations), actively tried and succeeded in sabotaging him from taking training against this agreement. Plaintiff, being denied guaranteed training, instead spent 3 full years in an on the job training status instead becoming a Subject Matter Expert (SME) under the mentorship of a well seasoned senior graded female mentor. It was around the time of Plaintiff becoming a SME in the area assigned (Logistics IT Compliance and Auditing) that he began getting harassed by HQ AFMC/A4N management. Coinciding with his full promotion to the maximum performance grade of the position of GS-12. This early set of attacks on his status and growth (pay in particular) is noted below. May the court please consider the second element described in 2015/2016 as fostering the environment for the first element, Plaintiff simply cannot ascribe the Offenders' behavior in total beyond what he perceives is the motives of other persons acting erratic who were not treated in a similar fashion to him (Plaintiff was medically ill as

justification for his behavior, his senior leadership was not at HQ AFMC) due to their senior

status at the agency they worked for and U.S. Government at large (where its senior leadership

are not often or at all held accountable for abusing their power).

9.      Beginning on or around June 21, 2017, Plaintiff became the subject of persistent and

constant harassment by management officials and other employees at HQ AFMC based on

outside factors (to include his sexual orientation/gender identity and personal life described in

OSC Form 14) not adversely affecting his job performance or on the ability of others to perform

their jobs (violating 5 U.S.C. § 2302) (b)(10)) but for in certain cases their unlawful violations

of federal healthcare statutes, cybercrime statutes or use of private investigations (considered

stalking in DoD regulations) to collect information about the Plaintiff to stalk and haze him

violating Title VII Of The Civil Rights Act of 1964 (CRA), as amended, The Health Insurance

Portability and Accountability Act of 1996 (HIPAA), as amended, Computer Fraud and Abuse

Act of 1986 (CFAA), as amended, The Stored Communications Act, codified at 18 U.S.C.

Chapter 121 §§ 2701–2712, as amended, The Hatch Act of 1939, as amended, Ohio Revised

Code § 2903.211, DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian

Employees', dated 30 June 2020, as amended (stalking identified in the glossary under which

private investigation from one employee to another is identified as part of this), DoDD 5505.06

'Investigations of Allegations Against Senior DoD Officials' and DoD Workplace Violence

Prevention and Response Policy", dated 16 January 2014; separately but earlier in 2015/2016

experiencing violations of the Equal Pay Act of 1963, as amended and part of the larger Fair

Labor Standards Act of 1938, Public Law 88-38, Title 7 of Public Law 88-352 by a female

supervisor reassigning workload on multiple occasions from female staff members being paid

substantially more than Plaintiff to do as his own work for less pay or assigned considerably

more workload in the same area of responsibility than much higher paid senior female staff members and as part of an overall beginning effort to belittle Plaintiff (which was captured on audio), further violating DoDI 1020.04 classification of such behavior as hazing by that female supervisor (Plaintiff was on the verge of assignment of a higher rank or status around this time also but far below the female staff members still in annual wages for exact work being performed); and finally Plaintiff has been subjected to unlawful hiring discrimination in the federal sector since 2018 (evidence Exhibits 10-25) in which he is unlawfully disqualified for employment opportunities based on lies of Defendant (i.e. lying about his performance by a senior leader (SES) not matching his work performance records signed by Defendant's management, lies in Notice of Results (NORs) from USAJobs postings/applications with Defendant about not having the correct amount of specialized experience when established by resume/SF-50 or easily verified by Defendant's own internal records of Plaintiff's employment history (which they have unlawfully denied Plaintiff access to since 2016, a violation of AFI 36-129, Chapter 8.4.1.1 and his union/attorney since September 2019, a violation of Chapter 8.4.1.3 of the same AFI potentially to destroy evidence of comments among supervisors), stating nothing or blank in NORs without explanation as disqualifying him and stating he is not part of a qualified pool of candidates positions are advertised under which Plaintiff is easily established as part of being a  'Current/Former Federal Employee' violating Title VII of the Civil Rights Act of 1964 (CRA) protections on employment discrimination over gender identity and sexual orientation for having repelled unwanted sexual advances of Defendant's management, Rehabilitation Act of 1973, as amended for discrimination in hiring over the short-term disability Plaintiff encountered in the workplace with Defendant as being a basis for rejection from their poor references even after notified of a temporary disability and substantiated with medical

records, violating The Whistleblower Protection Act of 1989 (WPA), as amended by causing said hiring discrimination over protected disclosures of harassment to federal agencies or authorities (88SFS, OSC, MSPB, EEOC, District Court).

10.     Offender, for purposes of this filing against Defendant is the term DoDI 1020.04 uses for "An individual who engages in harassment prohibited by this issuance. The individual may be a Service member or DoD civilian employee, other federal employee, a contractor, or a vendor who does business with the DoD". The same DoDI states harassment as "Behavior that is unwelcome or offensive to a reasonable person and that creates conditions that interfere with work performance or creates an intimidating, hostile, or offensive work environment." More specifically sexual harassment as, "Unlawful discriminatory harassment that is based on conduct of a sexual nature. It involves unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when: It explicitly or implicitly becomes a term or condition of a person's job, pay, or career. For example: Submission to or **rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person; or **Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance; or It is so severe or pervasive that a reasonable person would perceive, and the DoD civilian employee does perceive, the environment as hostile or offensive." Hazing as, "A form of harassment that involves conduct, without a proper governmental purpose but with a nexus to employment, intended to physically or psychologically injure or create a risk of physical or psychological injury to a person for the purpose of: initiation into, admission into, affiliation with, change in status or position within, or a condition for continued membership in any military or DoD organization. Hazing does not include a properly directed command or organizational activities that serve a proper military or other governmental purpose. Hazing can

be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person. Hazing is evaluated by a reasonable person standard and includes, but is not limited to, a form of harassment that involves conduct, without a proper governmental purpose but with a nexus to employment, intended to physically or psychologically injure or create a risk of physical or psychological injury to a person for the purpose of: initiation into, admission into, affiliation with, change in status or position within, or a condition for continued membership in any military or DoD organization. Hazing does not include a properly directed command or organizational activities that serve a proper military or other governmental purpose. Hazing can be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person. Hazing is evaluated by a reasonable person standard and includes, but is not limited to, the following when performed without a proper military or other governmental purpose: Any form of initiation or congratulatory act that involves physically striking another person in any manner, or threatening to do the same. Oral or written berating (including electronic medium) of another person with the purpose of belittling or humiliating. Encouraging or coercing another person to engage in demeaning, illegal, harmful, or dangerous acts. Playing abusive or malicious tricks. Piercing, branding, handcuffing, duct taping, tattooing, shaving, greasing, or painting another person. Subjecting another person to excessive or abusive use of water. Forcing another person to consume food, alcohol, drugs, or any other substance. Soliciting, coercing, or knowingly permitting another person to solicit or coerce acts of hazing." Reprisal as, "A form of retaliation that involves taking, threatening, or recommending taking an unfavorable personnel action (demote, separate, treat unfairly, etc.); or withholding, threatening, or recommending withholding a favorable personnel action, for making, preparing to make, or being perceived as

engaged in the anti harassment process." Retaliation as, "Conduct that punishes a DoD civilian employee for asserting the right to be free from harassment in the workplace. Retaliatory behaviors include, but are not limited to, reprisal, ostracism, maltreatment, and criminal acts for a retaliatory purpose. Retaliation includes illegal, impermissible, or hostile actions taken with the knowledge of management against DoD civilian employees for: Filing or being a witness in a charge, report, inquiry, or lawsuit; Communicating with a supervisor or manager about discrimination, including harassment; Answering questions during a DoD Component inquiry of alleged harassment; Refusing to follow orders that would result in harassment; or Resisting sexual advances or intervening to protect others." Stalking as, "A form of harassment that includes repeated harassing, unwanted, or threatening conduct that would cause a reasonable person to fear for his or her safety or the safety of others. Stalking may occur through use of technology including, but not limited to, email, telephone, voicemail, text messaging, drones, cameras, microphones, and use of electronic tracking and monitoring and social networking sites. Stalking conduct may include, but it is not limited to: Following, spying on, or waiting for an individual in places such as home, school, work, or recreational places. Leaving unwanted items. Making direct or indirect threats to harm an individual, an individual's children, relatives, friends, pets, or property. Posting information or spreading rumors about an individual on the internet, in a public place, or by word of mouth. Obtaining or using personal information about an individual accessed through public records, using internet search services, hiring private investigators, going through an individual's garbage, following an individual, or contacting an individual's friends, family, work, or neighbors. In most state and federal jurisdictions, to include that of the Military Departments under the Uniform Code of Military Justice, stalking is a crime. And finally unlawful discriminatory harassment as, "Harassment constituting employment

discrimination prohibited by: Title 7 of Public Law 88-352 (discrimination on the basis of race, color, religion, sex, and national origin); Public Law 90-202 (discrimination on the basis of age when the aggrieved individual is at least 40 years of age); Section 701 of Title 29, U.S.C. (discrimination on the basis of disability); Public Law 88-38 (sex-based wage discrimination); or Public Law 110-233 (discrimination on the basis of genetic information)." Plaintiff brings these definitions to the court's attention in an attempt to at the very least hold Defendant accountable as per their own very well defined regulations prohibiting the harassment above and about to be described. They may not constitute the exact federal legal definitions for purposes of litigation here but are, again, a baseline of conduct for which the Defendant is in fact legally obliged to follow as a minimum for identifying and responding to allegations of harassment. Sort of self-governing regulations set by Defendant or a higher headquarters. So with this said, the first sexually based harassment incidents involved a supervisor (Offender Zane Butcher) sexually assaulting/harassing Plaintiff by groping him unexpectedly upon leaving work on June 21, 2017 at approximately 4:00 P.M., pursuing sexual encounters or contact by leaning over Plaintiff's desk in a sexually suggestive manner (like an ape with two fists firmly planted on the desk on the knuckles and bending over into what is commonly known as the doggy style position) on the following day June, 22, 2017 and also inviting Plaintiff over to his home in November 2017 which were all unwelcome advances, if not forceful as described.

11.     In conjunction with paragraph 10 on or around June 21, 2017, Plaintiff experienced inappropriate gestures from supervisor's contractor support in a hallway at work where they pointed their thumbs at their butts (June 22, 2017, multiple times throughout the day) and had earlier to supervisor's first sexual assault of Plaintiff been obstructing and interfering in mandatory anti-harassment (EEO) training by Coffing Corporation staff which may have proved

useful but for their interference to combat the abuse about to be orchestrated against Plaintiff.

Coffing Corporation CEO, Chris Coffing, mocked Plaintiff's training and inability to complete

his training under the conditions his team was causing Plaintiff by at a point stating "Who's

harassing you Andrew?" in a condescending voice. Another of Chris Coffings' staff (Adam

Phair), at a later point in mid-2017, shouted nearby Plaintiff, "Fine, just keep letting them harass

you". While another of his staff seated directly behind Plaintiff, with no other staff around,

blurted out in the same timeframe, "We just don't trust you anymore". Ushering in a new era of

the Trump Administration fully in command at Headquarters Air Force Materiel Command. No

such behavior was encountered by Plaintiff at anytime prior to these zealots taking over the U.S.

Government in early to mid-2017 (Chris Coffing was a self pronounced Donald Trump

supporter). The agency had at a time prior encouraged employees to use online tools (distributed

one through e-mail from the senior leader level of SES/GO) to lookup other parties political

affiliations in the workplace (and likely eachother). Not so long after this, right winged

Republicans at the agency began harassing Plaintiff. Both the distribution of the tool and the

outcome of political harassment are violations of DoDI 1020.04 (stalking) and The Hatch Act of

1939. Plaintiff was later (mid-2019) contacted at his desk on at least one occasion with an

individual with no business contacting him but was a USAF employee at Warner Robins AFB,

GA stating his name as Donald Trump. It was not in fact Donald Trump but an impostor

harassing Plaintiff.

12.     The above offensive conduct would continue over the next two years, including but not

limited to Plaintiff being sexually assaulted on February 8, 2019 (in the afternoon at a meeting)

where a co-worker (Offender Ryan Moorman) winked at him, moved seats next to him and

began rubbing his leg against Plaintiff's in a sexual and prolonged fashion to cause Plaintiff

discomfort enough to move his leg away and note the incident; was sexually accosted on

February 13, 2019 (at 10:00 A.M.) by a, at the time, friend in the workplace Offender Jon Porter,

with a statement "Do you want some dick?"; subjected to numerous sexual comments and

gestures including someone drawing three hearts on a post in his cubicle area in 2018 (photo

evidence is Exhibit 24); forced (phone shoved into Plaintiff's face abruptly) to watch two

pornographic films in 2018 by Offender Jon Porter, one of which he was attempting to distribute

to Plaintiff and is likely a violation of federal obscenity laws that had a female eating human

fecal matter out of a glass (exceeds content deemed obscene in USA v. Paul F. Little, No. 08-

15964 (11th Cir. 2010) in one of the rare/recent obscenity cases in the U.S.) and another which

offended/attacked Plaintiff's sexual orientation choice and was of two homosexual men engaged

in anal sex, Plaintiff upon both the first and second occasions of this unlawful sexual harassment

demonstrated disgust towards Offender telling him to stop playing the content in his view;

stalked by his previous supervisor (Offender Zane Butcher) on February 13, 2019 to a doctor's

appointment where the supervisor left a memento (a rubber ducky) in the parking lot that the

supervisor then later used atop all member's of his branch's desks under the claims of charity

work (the date, time and location of the doctor's appointment could have only been obtained by

violations of earlier described healthcare/cybercrime statutes as Plaintiff never revealed his

medical conditions, treatments or providers to anyone in the workplace) violating The Health

Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, Computer Fraud

and Abuse Act of 1986 (CFAA), as amended, The Stored Communications Act, codified at 18

U.S.C. Chapter 121 §§ 2701–2712, as amended, Ohio Revised Code § 2903.211 (civil stalking

and potentially menacing), DoDI 1020.04 'Harassment Prevention And Responses For DoD

Civilian Employees', dated 30 June 2020, as amended (this behavior is bullying, harassment,

retaliation, stalking, sexual harassment and hazing under this instruction); Plaintiff's personal

computer at home was subjected to cyberhacking, intrusions, DDoS attacks and ultimately

destruction in fall 2017, where in short timing to its destruction a division secretary (female

contractor) made innuendos of having knowledge of Plaintiff's personal computer configuration

that had been destroyed by hacking, a violation of the Computer Fraud and Abuse Act of 1986

(CFAA), as amended, Ohio Revised Code § 2903.211 and DoDI 1020.04 'Harassment

Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended-

neither federal officials or federal contractors are granted immunity from such provisions; which

coincided with in the workplace hazing, bullying or cyberattacks of his personal workstation in

mid-2017 to include disabling printing capabilities when trying to print what Plaintiff thought

were sexually harassing e-mails, issuing notifications of dual IP addresses or remote connections,

regularly changing window sizes or timings to make the computer unusable to the point it was

released as his work property to a Federal cyber-security specialist contractor (that never

revealed the outcome of his analysis-Jim Gibson); and during MSPB proceedings in June 2020

Plaintiff's iPhone 6s was hacked into with a photograph burst aligning with language stated by

Offender Zane Butcher in a USAF disposition/pleading (occurred the same day the Defendant

pleading/disposition was uploaded to MSPB's servers and was in relation to Offender Zane

Butcher's watered down omission of brushing just his sleeve against Plaintiff's butt, violating

again the Computer Fraud and Abuse Act of 1986 (CFAA), as amended, Ohio Revised Code §

2903.211 and DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian

Employees', dated 30 June 2020, as amended; and Plaintiff was ostracized by a female support

contractor in Spring 2019 over an old relationship that he had not revealed to any staff members,

the contractor stated, "Your 23 year old girlfriend is crazy" looking right at Plaintiff and him

passing by her (Plaintiff had an ex-gf the exact age then of 23 that he had stopped seeing perhaps 4-6 months prior, when 22); Plaintiff was similarly at one point also hazed by a male supporting contractor of Offender Michael Leies, where he was medically targeted with very specific information in passing pertaining to (HIPAA Privacy-redacted). Plaintiff at a time earlier had resolved to move away from this particular support contractor for making anti-Democracy statements in the workplace (describing how he wanted Donald Trump to be king) and proceeded into preaching gospel messages and at times calling persons the N word, causing Plaintiff to request to move away from him; violating The Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, Computer Fraud and Abuse Act of 1986 (CFAA), as amended, The Stored Communications Act, codified at 18 U.S.C. Chapter 121 §§ 2701–2712, as amended, Ohio Revised Code § 2903.211 and DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended. As Plaintiff, again, did not reveal this relationship to Defendant, information used to make known of her existence without his consent of revealing such factors would likely have come from interception of text messages, social media messages and/or private investigation of Plaintiff's personal life. If the ex-gf contacted the employer with this information, they are still liable under applicable anti-harassment statutes for misusing the information to harass, haze and bully Plaintiff (and violated DoDI policies noted). Plaintiff has evidence (Exhibit 25) that stalkerware was being used against him and to the degree of matching Defendant's knowledge of Plaintiff's personal life, there is a high likelihood they originated the planting of it onto Plaintiff's devices. Who else has access to a factory shipped laptop or can make such a request or may ask an anti-virus company to disable flagging or identifying a well known stalkerware virus from the factory with paid anti-virus installed from day one of possession. The U.S. Government alone likely. Again, violating the

28

Computer Fraud and Abuse Act of 1986 (CFAA), as amended, The Stored Communications Act,

codified at 18 U.S.C. Chapter 121 §§ 2701–2712, as amended, Ohio Revised Code § 2903.211

and DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated

30 June 2020, as amended; Further, Defendant violated Plaintiff's right to attorney-client

privilege and Fourth Amendment protections from illegal search and seizure by intercepting e-

mails he made to a local attorney in April of 2019. In response to Plaintiff contacting an anti-

harassment lawyer, Defendant (or closely affiliated party-links to the agency Plaintiff worked

for) sent out within 13 minutes military SAPR/SARC e-mails in reference to obtaining help over

sexual assaults by military personnel. Then within short timing to this Plaintiff's senior

leadership at HQ AFMC/A4 sent out further sexual assault related e-mails throughout the day

(Exhibits 26-29). Within the month of this and calling the union to disclose harassment,

Plaintiff's immediate supervisor abruptly spoke of retiring and moving away to South Carolina

and also tried to coerce Plaintiff from his job when his plans to move were not realized

(discussed in more detail later). This corresponded later with a performance review in early to

mid-2019, where Plaintiff's immediate supervisor in described evaluation alluded to knowledge

of a dead relative of Plaintiff and insulted his relatives way and standard of living. He had also in

late 2018, on the day/morning Plaintiff closed on his house sent out an e-mail to the entire branch

regarding the Penski moving corporation. Plaintiff was being cyberstalked and stalked by both

his previous and at the time immediate supervisors with the aid of the agency using technology

intrusions and interception. Violations of the Computer Fraud and Abuse Act of 1986 (CFAA),

as amended, The Stored Communications Act, codified at 18 U.S.C. Chapter 121 §§ 2701–2712,

as amended, Ohio Revised Code § 2903.211, the Fourth Amendment to the U.S. Constitution,

The Whistleblower Protection Act of 1989, 5 U.S.C. 2302b, Pub.L. 101-12 as amended and

DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended. Plaintiff told Chief ALJ at MSPB and demonstrated or attempted to demonstrate much of this government snooping on Plaintiff in order to get injunctive relief but was ignored by her and not addressing it. Defendant or an affiliated party went to the extent of modifying Plaintiff's pleading with MSPB, as to state Plaintiff was forgiving them for having committed the numerous crimes cited, which was carried out by cyberattacks on Plaintiff's laptop when Windows updates were needed. Plaintiff deserves substantive punitive damages against Defendant and prosecutions against offending parties for these privacy invasions alone that circumvented his constitutional protections to speak with a lawyer over Defendant's ongoing campaign of harassment.

13.    Plaintiff was, again, also taunted and harassed about his attempts to take anti-harassment training in what appears preparation by Offender Zane Butcher (and his contractors directly supporting him) and outside factors (outside factors noted in OSC Form 14 along with his sexual orientation/gender identity) not adversely affecting his work performance or that of other co-workers but for their unlawful intrusions into Plaintiff's personal life which has led to stress, anxiety and depression at times. Plaintiff was singled out in treatment from other military personnel at WPAFB by Defendant over activities described in OSC Form 14 that others he knew or knows were not discriminated against for their conduct similar to or actually going into breaking local laws. And the parties he knew directly engaged in the activities runs the course from military recruiters with wives and children, to civilian men married with children, military retired personnel, federal civilians from out of town, military personnel from out of town, family of military members or any number of different combinations of military affiliations. Plaintiff's conduct noted in OSC Form 14 was completely within the local law, posed no violations of

DoDI's and he has no record or blemishes on either his work or criminal records warranting the treatment he continues to receive for disclosing Defendant harassment (being denied his federal position and blacklisting for jobs). Plaintiff was further subjected to medical harassment on a number of occasions. In particular, on February 13, 2019 Plaintiff arrived back at his workstation at approximately 10:00 A.M. His friend at the time, Offender Jon Porter, came to his desk asking him to go for a brief walk, which they did most days twice (morning and afternoon-routine) to take a break from computer work. Plaintiff exited to hallway with Offender Jon Porter, Offender Jon Porter sexually accosted Plaintiff, as stated prior, Plaintiff stunned and bewildered makes a statement to change the topic saying, "No, I've been called a dick before though". Still stunned he walks around the corner with Offender Jon Porter to which a military uniformed worker walks out of a room and loudly states, "Space Warts" while looking at Plaintiff (Plaintiff had been treated for such a condition at an earlier point through his physician). Plaintiff noted the day and time on his cell phone of these two incidents. Later on in this same day, Plaintiff was called into a meeting with his supervisor and his supervisor demotes his duties and takes away his leadership role over one major program. Plaintiff had been to the doctor earlier in the day before all of this began at which he received an unfavorable diagnosis (while being harassed on the way into his doctor by a previous Offender supervisor, friends with his then immediate manager Michael Leies and possibly the female contractor noted earlier who made a comment about his ex-gf in passing following him-photo Exhibit 31). These were/are violations of the The Health Insurance Portability and Accountability Act of 1996 (HIPAA), U.S.C. § 2302(b)(10), Computer Fraud and Abuse Act of 1986 (CFAA), as amended, The Stored Communications Act, codified at 18 U.S.C. Chapter 121 §§ 2701–2712, as amended, Title VII of the Civil Rights Act of 1964 (CRA), as amended, Ohio Revised Code § 2903.211, the Fourth Amendment to the Constitution

and DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended. In late 2018 (December) before this, Plaintiff had given a ride home (dorms on base-temporary housing) to USAF pilot cadets in a blizzard from a night club (they followed Plaintiff to his car and asked for a ride), during the trip back to their dorm, cadets hazed Plaintiff over the condition he was later diagnosed with on February 13, 2019. They trashed his car with hot sauce and stated in their free ride home that they would murder or kill someone who (HIPAA privacy-redacted for now, in relation to the condition Plaintiff diagnosed with). Indicating USAF knowledge of (redacted for now-related to condition) to which they later planned to harass Plaintiff over. Around same time of the incident (afterwards), a less senior civilian began making hot sauce comments in a mocking fashion around Plaintiff's workstation. Same junior civilian had also at another later point crawled around on the floor and grabbed a woman's ankles while possibly looking up her skirt (he was in his 50's). He also impersonated Plaintiff at an organizational picnic to a senior manager using Plaintiff's credential (indicating investigation of Plaintiff). Later, again, on April 5, 2019 (2 months later after earlier narrative events occurred) and after Plaintiff had discontinued friendship with long time friend Offender Jon Porter over sexually accosting him, Plaintiff was followed into the bathroom at HQ AFMC by military personnel and while in the stall two members started conversation including the words "Tanker Warts". Plaintiff has direct audio evidence of this harassment occurring, again with the offer to this court of the direct evidence itself in whatever manner it accepts such evidence (i.e. transcript or MP3 file) a polygraph examination over his allegations not captured on film, audio or photograph. Plaintiff recalls noting one more instance of medical harassment in 2019, on March 4, 2019 to be more precise, in an afternoon meeting with Offender Ryan Moorman present. Offender Ryan Moorman wrote language (redacted for now-HIPAA Privacy)

on white board behind him and in the course of the meeting pointed upwards in front of Plaintiff and attendees as to point at language (redacted-HIPAA privacy) affiliated with Plaintiff's medical condition(s) diagnosed on February 13, 2019. These are further violations of the The Health Insurance Portability and Accountability Act of 1996 (HIPAA), U.S.C. § 2302(b)(10), Computer Fraud and Abuse Act of 1986 (CFAA), as amended, The Stored Communications Act, codified at 18 U.S.C. Chapter 121 §§ 2701–2712 and DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended.

14.     Plaintiff reported all the matters set forth above to his collective bargaining representatives in February of 2019. In this telephone call with the AFGE, Local 1138 President, they largely agreed with Plaintiff's thought to get legal representation and consultation to see what would be the best way to stop the harassment. His collective bargaining unit said to call back when he had made progress on this. Plaintiff attempted to obtain legal counsel starting in March 2019 per e-mail evidence (Exhibit 33). On the very day Plaintiff got a response from a local sexual harassment attorney, Defendant (or a closely affiliated group) within 13 minutes sent out those earlier mentioned anti-harassment e-mails as actual attempts to intimidate Plaintiff from making a disclosure, speaking to a harassment lawyer or possibly suing them. Letting Plaintiff know they were watching him and who he was contacting (along with what about). Then within a few hours of this, the General Officer in charge of the Plaintiff's Directorate similarly sent out more anti-harassment e-mails (sexual assault based, the basis of Plaintiff's e-mails to the local attorney). It is unknown if the General's e-mails were a causation of the affiliated groups apparent intrusions or he was involved in the interception as he may or may not have been part of the organization who sent the first e-mail. It was an external local IT centric board that included both civilian and military members, many with close ties or contracts with

the Plaintiff's agency of employment. Some members of which were former SESs at HQ AFMC. The General's e-mail pointed members towards DoD's SAPR process. The large majority of Plaintiffs co-workers (probably 80-90%) in HQ AFMC/A4 were civilian employees. SAPR under DoDD 6495.01 is only applicable to federal civilians on a limited basis if they are stationed OCONUS (overseas). Plaintiff, along with many other civilians DoD wide was required to take SAPR training every so many years, even though it was not an appropriate anti-harassment tool and was heavily promoted per the evidence Exhibit 7 by the Defendant over EEO. And given the earlier identified obstruction of this training towards Plaintiff, it seems his previous supervisor (Offender Zane Butcher) meticulously planned or prepared Plaintiff to be confused as to how to combat his later sexual abuse and harassment of Plaintiff he was later orchestrating with additional contract employees and managers including Offender Michael Leies. Offender Michael Leies did not commit any sexual misconduct against Plaintiff at any point. Plaintiff notes though earlier what should largely be construed as participation by Offender Michael Leies in stalking behavior in which he obtained access to illegally acquired personal or protected information about the Plaintiff. So the difference is mute in there has been no indications of why Offender Michael Leies was participating in similarly obsessive behavior as his friend and Offender Zane Butcher. These violations are noted earlier and are again to emphasize Plaintiff was being hounded by this employer originating from a sexual basis.

16.    Plaintiff was diagnosed on February 13, 2019 with a long term medical condition requiring medication. After he was unsuccessful in getting legal counsel after vigorously making attempts, he decided to focus on his health for a time and get treatment for his condition. In May of 2019, Plaintiff began taking Valacyclovir. He was dosed by a local physician named Ryan Bayko (now deceased) at 1000mg to take once daily indefinitely. The drug is used for multiple

conditions fortunately which provides Plaintiff some level of anonymity of what he was taking it for in these proceedings, as he wished to keep his condition private but for a few instances noted earlier to the court that need sealed/redacted from public view to preserve his medical privacy or what's left of it. The medical provider told Plaintiff, the only side effect was possible liver damage and that he would later be tested for harmful enzyme levels in relation. No other side effects were noted by Dr. Ryan Bayko. Plaintiff trusted his new doctor and took the medication without question, intending to meet later if any issues arose. Plaintiff was not aware that this well respected physician had dosed him as such to actually invoke a liver problem and done possibly to order needless tests later on at the expense of Plaintiff's health or liver. Within 2 weeks of taking the medication, Plaintiff wrote his doctor's office and noted side effects (physiological). Plaintiff, in later reading the notification notices, also notes the way it is written does not match his normal style of writing to medical providers (was written very childish, irrationally at points and is slightly embarrassing). Plaintiff's doctor did not advise him to discontinue the medication at this point and Plaintiff did not know (actually couldn't-becoming mentally incompetent) his issues would not go away after his doctor had stated in a May appointment if they arose. His words were it may take time to get used to the drug. Plaintiff over the course of summer 2019 developed worse and worse side effects to the prescription drug (not known at the time or were not investigated). It started with nausea, headaches, trembling and progressed into summer colds, heart attack feeling pains and then psychiatric (hallucinations, mania, altered mental state, mood changes-may have happened early as well as noted by the childish first contact with the doctor's office). Plaintiff at Exhibit 40, has proof that his personality had changed in a bizarre way. He wrote a Congresswoman, not from his own District, basically drivel and non-sense and carried on so through the summer of 2019. Plaintiff has no memory as to how or why this began.

Plaintiff also has found notes he wrote from Summer of 2019, where he documented side effects occurring of the psychiatric nature as a side note to a music festival he attended which is out of the ordinary for him to do so at that time (including hearing a McDonald's intercom talking to him while parked in a Wendy's lot or seeing people/birds popup along a drive home that were not there). Plaintiff at a later point of withdrawing and upon research on his own (his doctor passed away in June of 2019), found the drug to be dosed twice what was required or needed per Plaintiff's specific set of circumstances and at such a high level was noted to have caused many of the side effects he experienced. Plaintiff withdrew from the drug in Nov/Dec 2019 timeframe and found correct dosage information in perhaps Jan 2020 leading towards a February 2020 request through AFOSI for medical reinstatement and accommodation. All timely actions by Plaintiff. The side effects are public knowledge factors about the drug when doing searches of public health institutions on the topic such as the Mayo clinic. His trust of his physician's course of treatment should be noted as common among patients. And unfortunately, while experiencing significant psychiatric side effects of medications, stress and workplace hostility, on or about August 18, 2019, Plaintiff called off sick from work to recover on August 19, 2019 and Defendant alleges Plaintiff later called his immediate manager on the evening of August 19, 2019 to resign and threatened him after work hours. There has been no proof this actually happened by Defendant. Defendant in confronting Plaintiff when he returned to work on August 20, 2019 casts doubt and uncertainty over this set of allegations against Plaintiff in their filing with the Merit Systems Protection Board along with a secret recording Plaintiff was taking. Plaintiff recorded his workplace out of habit after the February 2019 harassment intensified noted earlier. Both his immediate supervisor, Offender Michael Leies and previous supervisor, Offender Zane Butcher, were recorded on August 16, 2019 speaking near Plaintiff about calling

the police on employees, a story about doing so. Plaintiff does not recall this conversation even occurring near him (5-10 feet away), but later found it when trying to see what was going on around that time. Plaintiff's memory of the moments around that time are of Offender Zane Butcher walking by him and mocking Plaintiff over a woman who had gone missing to Plaintiff a week or two prior at the music festival described previously. Upon review of the audio, no such conversation or words ever occurred from his previous supervisor at that exact time he thought but instead talk of calling police on employees was heard. This audio evidence has been provided to EEOC but offered to every federal official in both filings up until this point with none likely even reviewing when so permitted at EEOC. It is again, so offered here with this filing in numerous forms (i.e. transcripts or MP3 audio file). They ignored the reality of the base's unlawful and abusive treatment of Plaintiff by Defendant in violation of DoDI 1020.04. Plaintiff was hallucinating again on August 16, 2019 as just described (auditory/visual hallucinations are a real side effect as he was dosed) and over the weekend likely (Plaintiff has no memory of this time period-a side effect of the drug also and to a lessor extent his condition). As the Plaintiff continued on this double dosage, his psychiatric health deteriorated more and more along with working in a hostile workplace. What was only supposed to be 7 days at 1000mg, turned into 4 months at that point. The proper dosage of 500mg was not known to Plaintiff until about February 2020. The doctor committed malpractice and did not correct his error when Plaintiff notified him of early onset sickness from it. The Defendant who had earlier (on audio evidence) harassed Plaintiff over medical issues, unlawfully acquired through interception or meddling of some sort, claimed ignorance of any such matters on August 20, 2019. After earlier trying to coerce Plaintiff from a job for disclosing harassment to the union (and the cowardly reaction of the immediate manager to flee the state), they now had their chance to get rid of the problem as

they saw it (the victim). Plaintiff was mentally incompetent from May to November 2019 until

he ran out of this overdosed prescription drug. Defendant likely knew there was a medication

error from day one, due to their apparent intrusions into Plaintiff's private life with technology.

The fact that his previous manager Offender Zane Butcher left a memento in the parking lot of

Dr. Ryan Bayko's office is suspect that the employer interfered in Plaintiff's health matters also.

It is not the first time a federal manager has done so either, there are EEO(C) cases publicly

available online where federal managers call into medical provider's, acting as a figure of

authority to either get HIPAA protected data on employees or outright alter treatment. As

Offenders Michael Leies and Zane Butcher were trying to get the Plaintiff to leave his career

position in an area where he was a bonified expert above many staff members, Butcher and

Leies did not have the Defendant's/USAF's interests at heart. They were selfish and wanted to

ruin a good persons career because Offender Zane Butcher did not get his sexual advances

reciprocated. They both interfered in 2018 in Plaintiff's earlier attempts to both advance

professionally and leave a hostile workplace because of this. The Exhibit 10 evidence of Plaintiff

applying for a job at WPAFB for the same series and one higher grade was met with outlandish

lies that he did not possess the specialized experience to do the job. The Plaintiff was 2-3 years a

GS-12 Logistics Management Specialist applying for a GS-13 Logistics Management Specialist

at the same base under the same MAJCOM (leadership). Again, another position in fall of 2018,

at the same base for the same series/grade just mentioned resulted in a USAJobs NOR showing

just a blank space for why he was disqualified. This is plain and simple a violation of numerous

discrimination statutes for refusing sexual advances of a manager and they continue (these type

of NORs) until this day. Plaintiff has sent EEO Complaints to 8 agencies trying to seek redress

over these matters but would prefer to consolidate damages to this filing as the worst offending

38

agencies are not responding to the formal complaints. The Defendant has violated Title VII of The Civil Rights Act of 1964 (CRA), as amended, in its employment discrimination against Plaintiff over his sexual orientation/gender identity, potentially The Hatch Act of 1939, as amended, as reprisal in hiring for earlier investigations of his political affiliations met with harassment (agency leadership was openly hostile towards liberals and socialists pronouncing them losers aloud in the work environment at points), Rehabilitation Act of 1973, as amended, for current efforts of federal officials to hold Plaintiff accountable for unproven/unsubstantiated behavior during a time of medical disability, DoDI 1020.04 'Harassment Prevention And Responses For DoD Civilian Employees', dated 30 June 2020, as amended and potentially Title 7 of Public Law 88-352 if you consider he was/is a straight male being harassed and accosted by an effeminate male (closeted gay man with female gender identity) to the point where he tried to trap Plaintiff in his web of abuse (destroying career opportunities) or cause him to resign. They both wanted him gone after those initial refusals of sexual reciprocation with Offender Zane Butcher. Taking years of time to chip away, chip away at Plaintiff's psyche and finding an easy opportunity in what should have been an otherwise healthy endeavor of trying to get treated through a trusted doctor in the base community of Beavercreek, OH for a rather common condition medically. So the Defendant and the alleged targets of threats from him were disingenuous with base police officer's (88SFS) when they arrived to what later became an endeavor to cover up the predator employees' crimes against the Plaintiff. Instead, turning things around on the victim Plaintiff and even in recorded conversation stating that the Plaintiff should have tried to cover up the abuse ongoing against him instead of telling them, the union and local lawyers about it. Plaintiff's medical condition/disability also casts doubt on these allegations of him resigning and threatening harassing management at HQ AFMC, as he has no memory of

calling in a resignation or threatening the immediate manager identified. Plaintiff was not at work when these alleged calls were made, he was ill and at home on sick leave. His immediate supervisor was not likely at work either. This also happened within a short time-frame of a approximately a week after Plaintiff's immediate manager made a threatening gesture (as if to use a knife across his chest-thrashing gesture) towards him in a weekly staff meeting in conjunction with outside parties. This is the memory the Plaintiff has of August 7, 2019 right after the Dayton, OH shootings in the Oregon District is of his immediate manager doing this to him. During the beginning stages of hallucinations and still being harassed. He could not have competently resigned, threatened or made any major decisions regarding a career he liked during this time-frame from May to November 2019. Any such behavior would be involuntary. In Plaintiff's arguments with MSPB (Exhibit 41), he notes these issues for the judge. Plaintiff asks the judge to please allow leeway on his statements to the Chief ALJ, as he was left to file on his own with one or two days left before her deadline was coming near. The quality suffers, but he was also experiencing cyberattacks as noted earlier targeting his pleadings content. She (ALJ) told the Plaintiff in her guideline for presenting a legally based winning argument (Exhibit 6-based on federal statute), that if he demonstrated mental incompetence as in relation to an alleged resignation it was cause for reinstatement as an involuntary resignation had occurred (if that occurred which she and the Defendant assert did happen in legal forums publicly, just not behind closed doors and being recorded secretly-which Plaintiff, again, has of the Defendant). He has/had doctor's office communications and the rest of the records of getting sicker and sicker to the points of being not himself for 6 months through the malpractice of a well respected military community doctor. He had and presented her with e-mails and online chats during the time that were not his style and were erratic/bizarre according to his own admission. He is not someone to

not be trusted by all measures. He similarly, has been vetted through a rigorous U.S. Government security clearance process into a position of public trust where he was providing programmatic advisement to very senior government officials at HQ AFMC and up to and including the Secretary of the Air Force (SAF) in his job roles. The officials at HQ AFMC attacking an employee entrusted with auditing and auditing capability to ensure their taxpayer dollars were being spent wisely are the one's not to trust. Plaintiff had taxpayer's interests at heart and embedded into his job at HQ AFMC. His role, by its very nature, made or makes him a target for potential nefarious employees or officials to undermine him with tactics described here as occurring. She (ALJ), a high ranking federal judge at MSPB, backtracked on her word to the detriment of justice and proved herself inept towards that aim (taxpayer money being given to a federal employee not doing their job as required under the law). She lied and stated the earlier noted federal statutes describing different types of managerial wrongdoing (PPPs) were exactly the same. She also stated if he demonstrated a hostile workplace that most people would resign under, it would suffice as well in reinstating him to his employment. Could she endure years of the described harassment without resigning, could her children, relatives, spouse, friends or anyone else she knows? I should think not. So what is the expectation of the courts that Plaintiff has not suffered enough to deserve his career he worked hard for back and chance to finish out his service to America. This along with what was minor remedy requested for major offenses against him (not anymore). He has 15+ years of exemplary work ratings from various managers (including the one's who harassed him strangely enough). Little to no negative comments on any of 15+ years of working for someone is quite simply amazing. Who even gets to work for the same employer for 15+ years anymore, let alone what employer gets a steady output and consistently good performance from someone for such a long time. It's because its in his blood.

41

Both his father and grandfather (Vietnam Era veteran and purple heart awarded WWII veterans) worked their entire careers for the same firms/government. It affords an opportunity to demonstrate loyalty and stability in one's life. The Plaintiff being of marriage age, damaging this aspect of his life would only serve the interests of the Offenders who are attacking this aspect of Plaintiff's life by trying to drive now instability and the hatred of the community Plaintiff grew up in because they are criminals who cannot admit to their wives or community that they sexually abused someone and are actually gay. They brought base law enforcement in as support, who are heard on recordings calling the locals in Dayton, OH "Ohio Fags". A rather vicious attitude for military personnel and former interrogators overseas in Iraq and Afghanistan that were welcomed into the community with warmness by the same locals they are heard trashing on audio. Plaintiff has the same desire as many do to set his roots in the town he grew up in and work in a consistent (stable) job. Much to the expressed hatred and chagrin of his once immediate supervisor Offender Michael Leies, who took towards insulting Plaintiff over this aspect of his life. Defendant's former supervisor berated Plaintiff in private performance reviews over this. Trying to coerce him from something he liked doing and in an area he grew up in because they (Offender Michael Leies) told my client that their careers were not as desired with the military. Offender Michael Leies, Plaintiff's immediate supervisor, brought up what sounded like his dead uncle's life of working for the same company his entire life in a private meeting that was supposed to be about Plaintiff's accomplishments to this end to demonstrate what he thought was a bad life strategy. Settling down in one place and working a career at a reliable job near family and creating a family was somehow wrong to him. Plaintiff's father had resettled to the area he lives in for work, after his father (Plaintiff's grandfather) had settled in Northeast Ohio for the same after WWII and going to college (delayed due to the war). Plaintiff deserves to be

the first in a long line of career nomads serving their country to stay in the place he grew up in for work. His family has sacrificed for stability. Plaintiff deserves to be respected for the service he has given to his country and allowed to perform more if he so chooses. Not to let another man try to decide what his life, liberty and pursuit of happiness should be because his (Offender Michael Leies) did not go according to his wishes. What does Offender Michael Leies have to complain about anyways? He has multiple retirement incomes, his wife may or may not have the same (per his conversation in the office), he's married and has one daughter that Plaintiff's knows about from photos on his desk. Why did someone with so much want to ruin Plaintiff's chance for the same? Selfishness and close mindedness. Plaintiff made every attempt to befriend Offender Michael Leies before his disturbing behavior began but was met with coldness and later hostility for no apparent reason. Offender Michael Leies gave Plaintiff no chance to get on his 'good side', whatever that may be and frequently allowed himself to be used by others he thought were his friends that told Plaintiff a general lack of trust or confidence in Offender Michael Leies's supervision. Offender Michael Leies did not like non-military members and Plaintiff enjoying a professional or personal life without his meddling. To the point of illegality and breaking privacy laws earlier described as broken by him. Offender strangely resorted to unlawfully investigating Plaintiff instead of asking him questions about himself in their numerous interactions (almost daily). Apparently in an effort to later describe Plaintiff as a social introvert, which he is not in normal times (being thrown out of your normal life and career are not that for Plaintiff).

17.    In returning to his being confronted by police on behalf of Offenders Michael Leies and Zane Butcher, when Plaintiff next returned to work on August 20, 2019 after allegedly resigning and threatening his supervisor, he was interviewed by Defendant's police force, handcuffed,

43

removed from the worksite, detained, possibly interviewed again, possibly tortured, released and placed on investigative leave or suspension without any indication later of the investigation's outcome or his employment status or sexual harassment investigation officers promised earlier (they lied and violated DoDI 1020.04). Plaintiff, while still employed (per 88SFS on audio and on August 20, 2019 at the end of the workday) made a formal unrestricted disclosure of sexual assault, sexual harassment and stalking/privacy violations to base police. According to DoDD 5505.06, the possible privacy violations cited occurring against Plaintiff by up to and including the General Officer level (breaching his attorney client privilege) required 88SFS to report this misconduct to DoD IG for investigation within 5 days. Not only did they violate this DoD policy, they violated most of DoDI 1020.04, Harassment Prevention And Responses For DoD Civilian Employees, dated 30 June 2020, as amended. They violated this regulation and became violent/hostile against Plaintiff after they spoke to Plaintiff's very senior leadership (a SES). The SES was very close with one of Plaintiff's sexual harassers, that being Offender Ryan Moorman. Plaintiff had little to no actual interaction with this SES for her to later defame and slander Plaintiff in Defendant's court submissions. She was trying to protect the predatory employee and had an opportunity on recorded audio evidence to talk to Plaintiff about what was ongoing in his workplace. She declined and instead her interaction with 88SFS lead towards the behavior described. It is unknown what she told 88SFS, that is not something recorded or picked up by Plaintiff's running cell phone at the time. If you go through almost every section of this DoDI (1020.04) in comparison to the way 88SFS treated the Plaintiff on audio as an employee disclosing sexual assault, sexual harassment, privacy/stalking violations and other hazing behavior, there is little they did not do backwards to the detriment of the victim Plaintiff. Plaintiff will next go through this very important and applicable regulation (DoDI 1020.04)

outlining section by section violations based on the audio he has recorded of interacting with 88SFS and their follow up activities (including AFOSI). This regulation is again, how 88SFS or any other responding official or receiving official of such allegations of harassment is supposed to interact with the victim and is a legally binding requirement on Defendant as a DoD Component: Section 1.2; Defendant violated parts (b)(1), the AFOSI investigation, which Plaintiff initiated on his own in February of 2020, was not impartial (in much of it HQ AFMC/A4N employees are praising one another, talking about their Christianity and mis-characterizing Plaintiff as a loner) and did not interview multiple harassers over what they did or was alleged by Plaintiff; (b)(2) no standard process was used in Plaintiff's complaints with 88SFS and AFOSI, 88SFS did no investigation (after promising to on audio) and Defendant used or is using to this day a base lawyer to combat holding anyone accountable (even with evidence of wrongdoing or offers of polygraph testing which they declared earlier a factor of trust in the matter); (c)-no leadership at HQ AFMC were held accountable including supervisors directly harassing Plaintiff; (d)-88SFS identified EEO as an assistive agency and then placed barriers between the victim and the help available (i.e. taking CAC Card, disbarring from the base, threatening fake criminal charges actually committed by predator employees through the union if he contacted the base EO offices); Section 2.4 (a) the behavior described earlier and later in this filing violates this, the corresponding reprisals identified indicate that no such confidentiality was maintained (post removal-Plaintiff encountered numerous crimes committed against him in his community of residence including base personnel trespassing into his home unexpectedly, dubious tax liens issues by Fairborn-a city just outside the base gates, vandalism, burglaries, tampering with evidence, destruction of evidence (medical), obstruction of justice by federal officials and their family members, apparent wiretapping, mail confiscation, theft of his voting

ballot from his residence and stalking while out doing things such as shopping or having a drink at a bar, a falsely charged/constructed minor misdemeanor-the employer enlisted members of the larger community to harass the Plaintiff with further traumatic behavior; (b) this did not occur and has not occurred at HQ AFMC-complete opposite; (c) 88SFS took no reports when asked to of sexual assault (on audio) and conducted no investigation of anything Plaintiff was telling them after earlier in the conversation making assurances of an investigation planned; (d) this section was violated, 88SFS did not respond to statements of sexual assault/sexual harassment with any meaningful actions, instead they attacked victim with violence, disparagement and civil rights abuses; (e) EEO mentioned and then shut off as a venue to receive help from (88 SFS obstructionism); (f) violated; (g) the harassment was not documented by 88SFS when asked to on audio recording, Plaintiff was in the midst of medical incompetence otherwise he normally would have; (h) employer and/or its management (along with support contractors) obstructed Plaintiff's EEO training into a status of confusion and failure; (i) see previous comment regarding employer interference in Plaintiff's EEO training; (j) unknown if violated or not, do not know which systems they are required to input data into; (k) nothing in this area occurred; (l) this did not occur, they refuse to substantiate the harassment with polygraph or evidence available; (n) since they will not substantiate any of the harassment or did not even interview certain subjects no input was made into managers or supervisor personnel folders regarding the climates they fostered nor have the managers taking part in the harassment been written up or fired in their personnel folders (Plaintiff has requested this previously in numerous filings); Section 3.1- This section was violated; Section 3.2, (a) (1)-this harassment occurred, Offender Zane Butcher groping Plaintiff and Offender Ryan Moorman rubbing his leg up against Plaintiff's in a prolonged sexual manner, interaction with 88SFS (pat downs after disclosing sexual

46

assault/harassment by males), possible torture in response to interviewing (on audio files); (2)

this harassment occurred (homosexual pornography and SCAT pornography), Offender Jon

Porter along with 88SFS Officer Cottingham on recording disparaging victim Plaintiff, subject of

sexual assault disclosure with gay jokes to try to cause other officers to mistreat Plaintiff; (4) this

occurred with the medical harassment recorded on audio and noted earlier 'Space/Tanker Warts'

whereas also 88SFS Officer Cottingham on audio recording was calling victim Plaintiff gay

while in custody and making statements as if he were holding Plaintiff hostage over this factor of

not admitting to this sexual orientation to support predator employee actions; (5) see previous,

this is about the same, military clothed members and also Officer Gomez insulting victim

Plaintiff when Plaintiff described multiple efforts to combat harassment; (6) see earlier

comments about homosexual pornography by Offender Jon Porter and SCAT pornography; (7)

Offender Zane Butcher accosting Plaintiff with 'doggy style' position over desk, civilians or

contractors pointing their thumbs at their butts in front of Plaintiff throughout the same workday

as that accosting, Offender Ryan Moorman staging medical harassment on white boards and

emphasizing protected HIPAA data written as such with gesture (requires privacy in revealing

condition to harassment encountered); (8) 88SFS trying to lump Plaintiff victim in with active

shooter category with no history of violence and after reporting workplace harassment; (9)

Whistleblower Intimidation/Retaliation (breach of attorney client privilege through unlawful

interception in order to intimidate Plaintiff), Offender Michael Leies trying to pressure Plaintiff

to leave his job after he spoke with the union and disclosed harassment, Offender Michael Leies

making a thrashing gesture across the chest in a weekly meeting (Plaintiff was on disabling

medication but still believes this happened), confronted by 3 88SFS officers and treated with

violence for disclosing harassment, audio file has torture, potential torture or threat of torture

identified as being used as an interrogation tactic; (10) multiple instances of veiled or expressive threats of violence by the officers of 88SFS; (11) see previous comments, officers of 88SFS threatening victim Plaintiff and even themselves at points of audio recording (i.e. one officer tells another he is going to kill him and no actions are taken by the police against him-hypocrisy); (14) Plaintiff has possible evidence of an Irish neo-Nazi symbol painted on the sidewalk on the way into work next to a #15 spray painted next to it, Plaintiff has a circle with a #15 tattooed on his hand and also a video of a gate guard that may be making a left handed Nazi salute towards Plaintiff, potentially harassing Plaintiff over neo-Nazi behavior he is not involved in; (15) the culmination of narration and instances described demonstrates years of hazing off and on in personal and private life starting in or around mid-2017 abruptly; 16) Plaintiff felt singled out for harassment and hazing while this was certainly their intentions to make him feel this way, it upset Plaintiff enough to disclose to union and try to get legal representation to stop it (bullying); Section 3.2 (b), (1) (2) (3) all three of these unlawful forms of harassment (they are stated as unlawful by this DoDI) occurred against Plaintiff at HQ AFMC, they are described in greater detail throughout this filing; Section 4.1 (b) Officer Gomez on audio was trying to convince Plaintiff he should have tried to keep matters quiet and not cause drama ('Squash the drama' were his words) that Plaintiff did not create actually (the Offenders did) versus accepting it was his responsibility to do his job, follow this regulation and investigate the agency into squashing/stopping the drama they were creating (Plaintiff kept his personal life to himself, the agency began invading his privacy to create drama in mid-2017-cyberhacking and interception likely to keep tabs on him); (c) Defendant publicly posting SAPR is a civilian program on their official USAF SAPR website but DoDD 6495.01 over the SAPR program states limited services only available to OCONUS civilians, EEO(C) is the correct agency per the policy restrictions

and there is potential for abuse of the SAPR program by Components (possibly dropping support to victims after 45 days to prevent any complaint from materializing), this section was violated, Officer Gomez said EEO was where he would help Plaintiff talk to specialists and then 88SFS, HQ AFMC leadership, 88SFS JA and base HR constructed obstacles in speaking with EO office on base ; (d) no processes or guidelines stated for resolving harassment other than EEO and possibly moving Plaintiff (the victim) out of their job-backwards logic, the predator employees should lose their jobs not a victim disclosing harassment; (e) the base conducted no investigation after 88SFS promised to and did not notify victim Plaintiff of employment situation until 3 months after stating he was still an employee on audio evidence; (f) employer has taken no actions against predator employees, nor taken any steps to correct the problem, their intention was to create an intimidating environment for the future; (g) predators treated with red carpet treatment (like heroes) for being scumbags; (i) there was a third party (Linda Long) that witnessed Offender Zane Butcher groping Plaintiff, she reported no harassment or not remembering it-no polygraph assessed on her, just one question enough to open a larger and more in depth investigation; (k) not sure what if any systems were used to input the victim Plaintiff's allegations into (none likely), AFOSI acted inappropriately after a complaint was filed (contacting Plaintiff's relatives somehow instead of him-intimidation tactic) and did not do a proper investigation; Section 4.3 Defendant violated this section with misinformation and obstructing justice (placing barriers between Plaintiff and the EO office on base), their misinformation was that Plaintiff could file at anytime in the future (88SFS stated this)-Plaintiff recently encountered this same type of behavior from EEOC over hiring discrimination as well in order to make deadlines pass; Section 4.4 (a) 88SFS did not take any reports or notes of criminal based harassment when asked to on audio recording. They are required to this by this clause of

this DoDI. Victim Plaintiff was not mentally competent and indications are employer knew this through unlawful interception of protected doctor/patient e-mails and online scheduling of treatment/diagnosis (the rubber ducky memento left in Plaintiff's providers parking lot later used by Offender Zane Butcher and his branch atop their cubicles under the guise of charity work); (b) 88SFS did not notify AFOSI as required by this section in reading it which is required, they should have been at the scene immediately as well as likely the SARC and EO professionals to figure out who had jurisdiction to handle victim Plaintiff's abuse allegations which were criminal in nature-**victim being in an upset state or angry is a natural reaction to such behavior and is publicly encouraged by WPAFB's SAPR/SARC office online (Exhibit 7); Section 4.5-Upon earlier/later described 'Whistleblower intimidation' tactics of Defendant of later sending out sexual assault e-mails after one was received by Plaintiff and within 13 minutes of Plaintiff receiving back contact of a harassment lawyer, the employer, the affiliated agency initiating the communication or that officer (GO) have violated Section 1561 of Title 10, U.S.C. In conjunction with the cyberhacking law violations cited earlier/later, this was an attempt to pull victim Plaintiff into SAPR/SARC Program, which according to DoDD 6495.01 does not apply to him as a CONUS civilian; Section 4.7-Defendant would not or could not completely affirm harassment occurred, AFOSI did not investigate Offender Jon Porter or Offender Ryan Moorman to obtain a response from them, Offender Zane Butcher alluded to some type of brushing contact with his sleeve occurring or possibly occurring against Plaintiff's butt (an under statement of a groping), the AFOSI investigator seemed to possibly be skeptical of Offender Zane Butcher's statement in her report-not much can be inferred from her report in this regard; Section 4.7(a) the only one punished was victim Plaintiff, not harassers nor was he substantiated in his claims (even after offering a polygraph exam) nor notified of what actions occurred because 88SFS conducted

no investigation other than against victim; (b) victim Plaintiff was kicked out of his job against the statements of the responding officers, no remedial action occurred against the predatory employees; (c) Plaintiff victim was provided with nothing in this section in terms of care or protections and instead encountered reprisal/retaliation noted earlier/later; (d) 88SFS refused on audio to document disclosed abuse against victim Plaintiff but allowed predator employees harassing victim to file police reports against him when they were conducting menacing stalking; (e) the environment became toxic for victim Plaintiff from mid-2017 and onward, not sure of other employees; Section 4.8-no investigation or documentation of harassment occurred and thus no later report required by this section occurred; Section 5, 5.1 Defendant heavily promoted SAPR/SARC and little attention paid to EEO or even legal action outside chain of command. SAPR, again per DoDD earlier cited just for OCONUS civilians on a limited scale; Section 5.2 Plaintiff's EEO training was obstructed by predator supervisor's support contractors; (3) This section indicates that all managers and supervisors of the agency were required to take the anti-harassment training necessary to properly manage a situation of harassment (up to the SES/GO level), the management of HQ AFMC was involved in the harassment while knowing the rules very intimately and how they could be manipulated above that of any average employee; (4) Every 3 years is an expansion beyond what used to be 1 year then lead to 2 years under the Trump administration, who can remember training 3 years later when you are busy in your work or even 2 years; Section 5.2 (b) Plaintiff's EEO training, again, obstructed; Section 5.3-harassing employees had to pass training to maintain employment and comply with it, they did not comply with training and violated many of it tenants mentioned; Section 6-Not familiar with the Components reporting requirements, the SAPR loophole identified could be unfortunately used to cause many to get no help if the agency drags its feet 45 days or longer then drops support

after promising SAPR Programs will help them, thus possibly preventing an EEO complaint from forming and the civilian having no rights to SAPR services under the DoDD mentioned earlier that limits it to just OCONUS civilians on a limited basis; Plaintiff notes this as an analysis of the Defendant's handling of him as a harassment victim which, again, in almost every regard violates the overarching rule of law in DoD for such matters as outlined. Plaintiff will next address one further applicable DoDI 1438.06 ' DoD Workplace Violence Prevention and Response Policy", dated 16 January 2014, as amended'. Section 2-Applicable to where employed; Section 3 (a) HQ AFMC perpetuated and encouraged through its senior leadership an environment in violation of this section "Workplace free of violence, threats of violence, harassment, intimidation, and other disruptive behavior. All employees are responsible for promoting a safe work environment."; (b) Defendant did not take Plaintiff's claims seriously, they tolerated the behavior of predatory employees by removing the victim from the environment and not the Offenders; (c) They committed all of these actions intended for the Offenders against the victim Plaintiff; (d) at HQ AFMC they went out of their way to violate them and this section; Enclosure 3-Nobody including Plaintiff's new lead (GS-14) as of February 2019 reported to management a threat of violence by Offender Michael Leies against him on August 7, 2019. Offender Michael Leies is required by this policy to self report his threat of violence against Plaintiff under this part of this policy as the supervisor of Plaintiff who was threatened by him. This pre-dates what they allege (without evidence) was a threat from Plaintiff. This incident was in front of an entire group of civilian employees who, to Plaintiff's knowledge/memory, reported nothing to superiors above him about his violent gesture or overall hazing/stalking/attempts to coerce Plaintiff from his job; (2) (b) there is anti-violence training provided to managers and employees and Offender Michael Leies was in a competent state of mind when he threatened

Plaintiff (while Plaintiff was not during the time of their allegations) and violated his training in these areas. The entire branch should have been subject to the report he was required to file against himself for threatening Plaintiff (it just so happens under this regulation to be his responsibility to accept and report of such activities by anyone, including himself); Glossary, Part II, Definitions-Violent Behavior, "The intentional use of physical force or power, threatened or actual, against a person or group that either results in or has a high likelihood of injury, death, or psychological harm to self or others." What Michael Leies did in that meeting described on August 7, 2019 in Plaintiff's memory to him meets this definition. Workplace Violence, "Any act of violent behavior, threats of physical violence, harassment, intimidation, bullying, verbal or non-verbal threat, or other threatening, disruptive behavior that occurs at or outside the work site." This is the DoD definition of these terms. What Michael Leies did on August 7, 2017 meets these definitions fully. One further analysis of DoDD 5505.06 'Investigations of Allegations Against Senior DoD Officials' results in one major violation by Defendant of this regulation (federal law violations later/earlier quoted) in when Plaintiff reported violations of his attorney client privilege as a privacy violations to 88SFS by HQ AFMC/A4 leadership, they were required by this policy to submit this for investigation to the DoD IG within 5 days. This, indeed, could have helped Plaintiff identify the exact source of privacy violations earlier than finding a stalkerware virus in June 2020 and may have helped identify if abuses were/are occurring in DoD monitoring programs against Plaintiff (i.e. active clearance monitoring). Although DoD writes regulations against its employees from researching each-other, their publicly known monitoring programs of employees far surpass their own definitions in many cases of what is called stalking (i.e. interception of social media, texts, data of employees with clearances). Plaintiff later asks as relief injunctive relief from Defendant or its higher units from

conducting this type of monitoring or surveillance of him due to later/earlier described abuses of federal statute to obtain information about Plaintiff used to haze and harass him without cause. Although the judge dismissed Plaintiff's claims of Whistleblower Retaliation as frivolous, she was well aware of evidence and audio evidence at that where they within short timing to a disclosure retaliated against the Plaintiff with arrest and later disbarment from the base community. But in the course of early interviewing, Defendant failed to provide Plaintiff any union representation when so requested, or an attorney during detainment (after being Mirandized and requesting counsel/stewards) violating Plaintiff's Weingarten and civil rights, both violations of NLRB v. J. Weingarten, Inc. 420 U.S. 251 (1975), as amended and the Sixth Amendment to the U.S. Constitution. Their eventual falsification of a SF-50 also in November of 2019 when the Plaintiff disputed a resignation was offered or accepted is also a violation of Loudermill hearing requirements that grant Plaintiff a forum to challenge what was actually a disciplinary action for making a protected disclosure of sexual assault, sexual harassment and numerous other employment violations by Defendant cited (cited as Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), as amended). Plaintiff had/has a proper interest in his position, as do many civil servants, per Loudermill vs Cleveland Board of Education, which also gives him civil service or employee rights to a formal hearing to contest disciplinary or proposed disciplinary action(s). Since Plaintiff was denying a resignation was his intentions when he was recovering (off his prescription) and then while now competent (but not only this but also on the audio recording of him interacting with 88SFS where they affirm his employed status at HQ AFMC up until the time of release from their custody and Plaintiff states he was not quitting), it is argued before the court that Plaintiff should be trusted by your honor based on his exemplary civil service record, lack of criminal/civil citations and well respected reputation in

DoD, even noted in USAF MSPB pleadings and audio recordings, that he never had any intentions of quitting or resigning as Defendant claims publicly but rather their intentions were to make him quit by any means necessary and as described. Such a compelling of a forced resignation with such extensive discrimination cited is similar or could even constitute what is traditionally known as a Constructive Discharge under federal interpretations. The EEOC's 3 pronged test for such a claim existing is predicated around there not being any actual statute declaring a legal definition of exactly what a Constructive Discharge is but rather whether multiple things were present when an alleged resignation occurs (it could be a host of major violations such as is present here). Those being would (1) a reasonable person in the Plaintiff's position have found the working conditions intolerable-check; (2) conduct that constituted discrimination against the Plaintiff created the intolerable working conditions-check; and (3) the Plaintiff's involuntary resignation resulted from the intolerable working conditions-possibly check. Although Defendant has proven no such activity occurred of a resignation (just their word when Plaintiff has a recording of them lying about numerous topics or not following their own DoDI's) and even privately stated they did not feel it was the Plaintiff resigning and **publicly states what they allege was one (a resignation) is okay to do in anger per their SAPR/SARC office website; if they wish to go that route again for this procceding Plaintiff requests this doctrine of Constructive Discharge be considered as cause for the redress requested as well as all factors appear to be met. Plaintiff, at no time competent, has stated he intended to quit and even when questioned supposedly on the day after doing so stated he had no intention of this but wanted to attack the harassment using legal means at least. All of the harassment and discrimination the Plaintiff has encountered is far beyond the reasonable standards test of what a normal person can or should tolerate in keeping a job. But he has the right to the job that was

taken from him by dubious people with criminal intentions towards the Plaintiff professionally

and in some cases personally (sexually).

18.     Plaintiff's resignation was not voluntary if they can ever prove with direct evidence it

occurred and was medically driven if present and was part of a long coercive campaign by the

Defendant's management and arose out of the hostile work environment he was subjected to over

the previous two plus years for not having reciprocated sexual interest in Offender Zane Butcher.

As stated, the Plaintiff has audio records of base police confronting him. Their behavior is, at

times, reprehensible, inconsistent and later violent (to the point of possible torture) or cruel

towards someone acting calmly and trying to tell you their side of things that required the same

of base police. Base police, on these recordings (where they do not know they are being

recorded), state they think what they allege are the Plaintiff resigning are artifacts of spoofing.

And, as their (USAF) MSPB transcripts of them show, one name stands out as a possible culprit,

that being Offender Jon Porter. One officer who listened to them said he thought they were

different voices between each. One of the few officers not heard twisting the Plaintiff's words

around or ordering he be tortured while in custody (a violation of 18 U.S. Code Chapter 113C—

TORTURE)). The Plaintiff recognizes 2 numbers as his, but has no memory of doing what they

allege and spoofing is an easy thing to do to people these days as a prank. The attending, first

responder officers were not rookies by and large. Their demeanor on the audio is that they were

experienced, their time was being wasted by everyone, they did not follow DoDI 1204.04

requirements when sexual assault, sexual harassment and other discriminatory crimes were

committed and they turned the situation around on the victim Plaintiff against what they are

permitted to do so under DoDI 1020.04, "DoD Workplace Violence Prevention and Response

Policy", dated 16 January 2014, as amended and DoDD 5505.06. When questioned on the audio,

the Plaintiff distinctly tells them he was not a threat or threatening Offender Michael Leies, his immediate supervisor. This was during an illegal interview by the way, but Plaintiff did speak with them unrepresented and ill in a respectable, non-aggressive manner (88SFS) after being unlawfully denied union counsel. He conveyed anger at having been harassed for years and even recently, described what had been going on in the workplace, how he tried to resolve the situation with great patience compared to most people and what his intentions were which was to expose the abuses named formally. He asked the base police to write down his claims, he was not well that day/nor the weekend prior, August 20, 2019 or clear until November or December 2019. It is actually, per DoDD(I)'s cited (including 1020.04, DoDD 5505.06 and "DoD Workplace Violence Prevention and Response Policy", dated 16 January 2014, as amended) Defendant's responsibility to create reports and document allegations of harassment and sexual misconduct by military personnel. Not only that, but bring in greater authorities under such allegations to include AFOSI. AFOSI, the base SAPR/SARC possibly and the EO office should have been there immediately with what was being reported. 88SFS instead wanted to cover up the abuse (their own words on the audio). The analysis conducted by Plaintiff of those three regulations earlier should have come from AFOSI, assessing violations by 88SFS of attending to a disclosure of sexual violence/harassment and other harassment by employees of the Defendant. They (88SFS) patronized Plaintiff's efforts to handle things in a manner approved of by AFGE 1138's leadership, federal law and proceeded into terrorizing him to the point of possible torture per several officer's statements (a violation again of 18 U.S. Code Chapter 113C—TORTURE). The behavior of the Defendant's police force, as caught on recordings is in alignment with the federal statutory definition of what constitutes torture and possibly some behavior of employees identified as Offenders as a seemingly calculate culmination of planned events. The federal

statute describes torture as to mean "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." As Plaintiff was in the physical control of three different responding officers, they are each equally responsible for both the orchestration of torture while in custody (per their statements to punch Plaintiff in the throat, wanting to, actually committing violent actions towards Plaintiff of squeezing handcuff until they damaged his hand(s) or attempted to construct violence against him based on lies to other officers while handcuffed and locked in a cell). The Defendant is ultimately the liable party for their behavior and they were at all points of the dialogue acting as official representatives of Defendant in all manners legally and personnel wise. Under the Weingarten statute, 88SFS is/was an official agent of the employer in the manner just described and after beginning a workplace investigation over arresting Plaintiff initially (which may have lead to earlier discovery of medication side effects if it had led to a psychiatric evaluation while in custody) invoked Plaintiff's employment rights (even if in the midst of medical mental incompetence). Please let justice be served here in your court.

### III.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendant Secretary of the Air Force and prays for the following relief:

A.    For reinstatement to employment at Defendant's Wright Patterson Air Force Base

facility; this at his full GS-12 grade/step or higher he would have been

at, but for their unlawful actions of removing him from employment after making

several disclosures of harassment (some of which was sexual)

B.    Back pay and lost benefits in excess of $300,000;

C.    Front pay and lost benefits including the right to a federal disability medical retirement in excess of $7,000,000 if reinstatement is not awarded; as Defendant (USAF) would not accommodate Plaintiff's medical condition upon almost immediate disclosure of healthcare side effects which is easily treated with a daily prescription pill at the proper dosage (500mg of Valacyclovir)

D.    Pre and post judgment interest;

E.    Attorney fees and statutory damages, plus costs;

F.    Compensatory damages in excess of $5,000,000

G.    Injunction stopping Defendant's and U.S. Government's electronic monitoring of Plaintiff used to harass, haze and stalk him

H.    Defendant be ordered to fire or retro-actively fire Offenders identified as sexual harassers in Plaintiff's filing per Defendant's procedures and Defendant be ordered to issue an official apology to Plaintiff

I.    Defendant ordered to expunge, delete or omit any digital registrations of Plaintiff in any of its law enforcement or employment systems for allegations of criminal wrongdoing which were used (if done) to retaliate against Plaintiff as a victim of their unlawful employment discrimination

J.    Such other relief as this Court deems just and equitable.

59

Respectfully submitted,

ANDREW ROLLISON

**/s/ Andrew A. Rollison**
ANDREW A. ROLLISON (Pro Se)
6807 Locustview Drive
Huber Heights, OH 45424
PH:     (937) 931-0751
FAX:  N/A

PRO SE REPRESENTATIVE

Note: Plaintiff's retained counsel has breached
agreements/retainer agreements with Plaintiff right
before EEOC deadline requiring Dayton Bar
Association grievance(s) to be filed. Not yet
resolved, (non) pro-bono representation may be
required to represent Plaintiff at a later stage after
unprofessional conduct addressed.

## CERTIFICATE OF SERVICE

I hereby certify that on this _20th_ day of October 2021, the foregoing was filed
electronically. Notice of this filing will be sent to all parties by operation of the Court's
CM/ECF and copies will be mailed via U.S. Mail to those parties to whom electronic notice
has not been sent. Parties may access the filing through the Court's e-filing system.

**/s/ Andrew A. Rollison**
Pro Se Representation

60

IV. Previous lawsuits:

If you have been a Plaintiff in a lawsuit, for each lawsuit state the case number and caption.
(Example, Case Number: 2:08-cv-728 and Caption: <u>John Smith</u> vs. <u>Jane Doe</u>).

<u>Case Number</u>                    <u>Caption</u>

3:20-cv-00380-MJN  Andrew Rollison  vs. Barbara M. Barrett, Secretary, U.S.
                                                                        Department of
_____    _____  vs. _____  the Air Force

_____    _____  vs. _____

Defendant will claim same case, explained in section III as to why not
(different claims). Judge ruled no claims made in filing above.

V. Relief  Dismissed without prejudice

In this section please state (write) briefly exactly what you want the court to do for you. Make no legal
argument, cite no case or statutes.

Section III has this very specific information
described and also at the back of civil
Cover Sheet. Section III as previous attachment for Section III

Reinstatement to Employment
Scenario 1 - $300K in backwages and benefits plus
$5 million in compensatory damages and for punitive
damages plus additional non-financial relief.

Not Reinstated to Employment
Scenario 2 - $7 million federal disability retirement.
Already requested employer reinstate and accomodate
medical condition/treatment in proper form/dosage.
(gave them access to medical records to establish
medication issues were causing me problems

I state under penalty of perjury that the foregoing is true and correct. Executed on

this 20th day of October, 2021.

_____
Signature of Plaintiff

-4-